Filed 12/11/14

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| JOSHUA GRAHAM PACKER, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | S213894 |
| v. | ) | |
| | ) | Ct.App. 2/6 B245923 |
| THE SUPERIOR COURT OF | ) | |
| VENTURA COUNTY, | ) | |
| | ) | Ventura County |
| Respondent; | ) | Super. Ct. Nos. 2010013013 & |
| | ) | 2012015764 |
| THE PEOPLE, | ) | |
| | ) | |
| Real Party in Interest. | ) | |
| _____ | ) | |

Penal Code section 1424 permits a defendant to seek to recuse a prosecutor for an alleged conflict of interest.[1] The statute establishes a two-stage process. Initially, the defendant files a notice of motion containing "a statement of the facts setting forth the grounds for the claimed disqualification and the legal authorities relied upon by the moving party": The factual allegations must be supported by "affidavits of witnesses who are competent to testify to the facts set forth in the affidavit." (§ 1424, subd. (a)(1).) The district attorney and the Attorney General may file affidavits in opposition to the motion. (*Ibid.*) After reviewing the motion

---

[1] Unless otherwise noted, all further unspecified statutory references are to the Penal Code.

and affidavits, the trial court exercises its discretion in determining whether the second stage, an evidentiary hearing, is necessary. (*Ibid*.) An evidentiary hearing may be required if the defendant's affidavits establish a prima facie showing for recusal; that is, if the facts demonstrated by the affidavits, if credited, would require recusal. (*Spaccia v. Superior Court* (2012) 209 Cal.App.4th 93, 111-112 (*Spaccia*).) In some instances, the affidavits might present disputed material facts, the resolution of which may depend largely upon the affiants' veracity and credibility under circumstances that can be determined only by holding an evidentiary hearing. If those credibility and veracity determinations, resolved in defendant's favor, would demonstrate that the conflict is so grave as to make a fair trial unlikely, the trial court abuses its discretion by failing to hold an evidentiary hearing.

In the present case, we conclude the trial court abused its discretion. Accordingly, the trial court shall be directed to hold an evidentiary hearing.

## I. PROCEDURAL BACKGROUND

### A. The Crimes and Petitioner's Arrest for a Triple Homicide

On May 20, 2009, a man wearing a motorcycle helmet entered the Faria Beach home of Brock and Davina Husted while they and their nine-year-old son and 11-year-old daughter were home. Their nine-year-old son witnessed the man rob his parents, and after the killer fled he found his parents' bodies. They had been stabbed numerous times, resulting in their deaths. Davina Husted had also been sexually assaulted. Davina had been four- to five-months pregnant, and her fetus was also killed.

DNA profiles were extracted from samples taken from Brock Husted's fingernail scrapings and from a motorcycle helmet visor found at the scene. The crimes were unsolved until petitioner Joshua Graham Packer was arrested on

2

unrelated felony charges more than six months later, in mid-January 2010. Because of that arrest, petitioner's DNA profile was obtained and that profile was eventually matched to the profiles derived from the Husted crime scene.

Petitioner was subsequently charged in an indictment with three counts of first degree murder, two counts of first degree robbery (§ 211), and one count of first degree burglary (§§ 459, 460, subd. (a)). The murder counts include allegations that petitioner personally used a deadly weapon (former § 12022, subd. (b)(1)), and committed the crimes while engaged in the commission of robbery or attempted robbery (§ 190.2, subd. (a)(17)(A)), and burglary or attempted burglary (§ 190.2, subd. (a)(17)(G)). The indictment also includes a multiple-murder special-circumstance allegation. (§ 190.2, subd. (a)(3).) The prosecutor is seeking the death penalty.

After further testing of samples taken from a towel found near Davina's body and of an oral swab collected from her, additional DNA evidence matching petitioner's profile to those samples was identified. As a result, the grand jury returned a second indictment against petitioner, including charges of first degree murder (§ 187) of Davina Husted, forcible oral copulation (§ 288a, subd. (c)(2)), use of a knife (former § 12022, subd. (b)(1)), and a special circumstance allegation that her murder was perpetrated during the commission of an act of forcible oral copulation (§ 190.2, subd. (a)(17)(F)).

In June 2012, the trial court consolidated both cases against petitioner.

### B. The Motion to Recuse the Prosecutor

In September 2012, petitioner filed a written motion to recuse Chief Deputy District Attorney Michael Frawley (Frawley or the prosecutor), the lead prosecutor on the case, pursuant to section 1424 on the following grounds: (1) the prosecutor appears to have known Davina Husted through Frawley's former wife, Lisa West;

3

(2) two of Frawley's adult children, Kyle and Elizabeth, knew petitioner through their involvement in a youth group and would be called as witnesses by the defense at the penalty phase if petitioner is found guilty; and (3) Frawley's daughter Elizabeth dated petitioner's friend, Thomas Cathcart, a proposed prosecution and defense penalty phase witness, and also knows Oscar Martinez and Steven Infante, both of whom had been identified as proposed witnesses for the prosecution at the penalty phase.

In support of his recusal motion, petitioner submitted 54 pages of affidavits from eight people, along with 350 pages of attachments. Petitioner also filed a separate motion objecting on compulsory process grounds to section 1424, subdivision (a)(1)'s requirement that he use "affidavits of witnesses who are competent to testify to the facts set forth in the affidavit" to make his prima facie showing, claiming that the affidavit procedure is insufficient for him to access witnesses who otherwise refuse to meet with the defense.[2]

In opposing petitioner's motion, the district attorney presented 70 pages of attachments, including affidavits from two people, one from the prosecutor himself. The Attorney General joined in opposing petitioner's motion.

Petitioner continued to investigate the matter and filed a reply to the district attorney's and Attorney General's oppositions, alleging two additional related grounds for the prosecutor's conflict of interest — that the prosecutor had actively interfered with the defense's efforts to contact the prosecutor's children and their

---

[2]     The United States and California Constitutions grant a defendant the right "to have compulsory process for obtaining witnesses in his favor." (U.S. Const., 6th Amend.; see Cal. Const., art. I, § 15 [affording "the right . . . to compel attendance of witnesses in the defendant's behalf"].)

4

friends, and that the prosecutor has a personal interest in not having his children testify at petitioner's penalty phase.

The parties moved to strike portions of each other's affidavits and attachments on several grounds, including speculation, lack of foundation, and inadmissible hearsay. The trial court partially granted the motions to strike and redacted various portions of the exhibits and affidavits.

### C. The Trial Court's Ruling and Subsequent Review

In November 2012, the trial court overruled petitioner's compulsory process objection, denied his request for an evidentiary hearing, and denied his motion to recuse the prosecutor. The trial court stated that its decision denying an evidentiary hearing would be the same even if it had considered all of the unredacted material.

Petitioner challenged the trial court's ruling in a petition for writ of mandate in the Court of Appeal, which summarily denied relief. Petitioner sought review in this court, and we granted review and transferred the matter to the Court of Appeal with directions to vacate its order denying mandate and to issue an alternative writ. The Court of Appeal gave the trial court an opportunity to reconsider its ruling, but it declined to do so. The Court of Appeal issued an order to show cause and set the matter for oral argument. In late August 2013, the Court of Appeal upheld the trial court's ruling and denied the requested writ of mandate in a published opinion.

Petitioner sought review of the Court of Appeal's decision, and we granted review in December 2013, limiting review to the issue whether the trial court abused its discretion by denying petitioner's request for an evidentiary hearing on the ground that petitioner had failed to make a prima facie showing that recusal was warranted.

5

## II. THE FACTS AND ALLEGATIONS RAISED IN THE MOTION TO RECUSE

In April 2010, four months after petitioner had been arrested for the underlying crimes, Frawley e-mailed petitioner's counsel, disclosing that his (Frawley's) children Kyle and Elizabeth had been acquaintances of petitioner while in high school. Although his children had attended a high school different from petitioner, Frawley explained that the three had associated with one another through their mutual participation in a youth group known as Young Life. Frawley stated that, in 2005, Kyle went on a four-day ski trip sponsored by the youth group and had shared a room with petitioner and four other individuals. Around this same time period, Young Life also sponsored a weeklong camping trip that was attended by petitioner, Kyle, and Elizabeth. Frawley also revealed that petitioner had visited the Frawley's residence "on two or more occasions" in which the Frawley family had hosted Young Life gatherings. According to Frawley, he learned that, in 2006, Elizabeth had hosted a social gathering in the backyard of the Frawley home, which petitioner attended "though he was not invited." Frawley, however, stated he did not recall ever meeting petitioner. He added that his "children have had no relationship with [petitioner] outside of the events described above." Finally, Frawley stated that petitioner's contact with his children would not have any bearing on his role as the lead prosecutor in this criminal case.

Petitioner's counsel responded by e-mail, asking Frawley how he had learned of petitioner's prior acquaintances with his children, what impressions his children had of petitioner, and whether there was a problem with petitioner being at the Frawley home uninvited. Frawley responded by stating he believed that, legally or ethically, no further disclosure was required on his part, except to state that he had mentioned that petitioner had not been expressly invited "only to avoid

6

the impression that there was actually a relationship" between petitioner and his children.

During the subsequent 30 months of pretrial discovery and investigation, the parties collected and then presented the following evidence in the affidavits and exhibits that were submitted for purposes of the motion filed by petitioner under section 1424.[3]

### A. The Prosecutor's Relationship to Davina Husted

Frawley and his ex-wife, Lisa West, divorced in 1997. In 2009, at the time of the charged offenses, West served on the board of directors of the National Charity League Juniors (Junior League) and victim Davina Husted was the Junior League's president. West also was on Davina Husted's Christmas card distribution list for 2008. A January 2008 spreadsheet recovered from Davina Husted's computer listed Frawley and his current wife as Junior League supporters.

In response to the foregoing facts, Frawley's affidavit emphasized that he had never met Davina Husted. He did not recall whether he had contributed to the Junior League, but stated that, in any event, the existence of such a contribution would not affect his handling of this case. He was also unaware that his ex-wife

---

[3] As previously stated, despite its extensive redaction of the affidavits and exhibits, the trial court nevertheless stated that it would have reached the same conclusion even if it considered all of the proffered evidence. In light of the trial court's statement, the Court of Appeal considered all of the proffered evidence in reaching its conclusion. Yet, section 1424 states that the recusal motion "shall be supported by affidavits of witnesses *who are competent to testify to the facts set forth in the affidavit*." (§ 1424, subd. (a)(1), italics added.) On appeal, the parties do not dispute the correctness of the trial court's redactions, and accordingly, in determining whether the trial court abused its discretion in denying the recusal motion without holding an evidentiary hearing, we will not consider those portions of the record redacted by the trial court.

was on Davina Husted's Christmas card list, but maintained that any relationship between Davina Husted and his ex-wife would not affect his handling of this case because he and his ex-wife had divorced some 15 years earlier.

### B.  The Prosecutor's Children's Relationship with Petitioner

Young Life is a Christianity-based youth group for high school students from various schools.  According to Kristy Benscoter's affidavit, submitted by petitioner in support of his motion to recuse, she and Frawley's children, Kyle and Elizabeth, all participated in the group for several years along with petitioner and mutual friends Thomas Cathcart, Steven Infante, and Oscar Martinez.[4]  In addition to camping and snowboarding trips, the group would meet every Monday, primarily for Bible study.  Petitioner, Kyle, Elizabeth, Benscoter, Cathcart, Infante, and Martinez would attend these meetings.  Some of these meetings were held at the Frawley home.[5]  According to Benscoter, she, petitioner, Cathcart, and other Young Life members were at the Frawley residence "all the time."  She recalled they that would socialize around the pool in the yard of the Frawley home.  Elizabeth hosted many such parties at the Frawley residence, outside of any connection with the Young Life group, which Benscoter attended along with the "boys," including petitioner.  She recalls Elizabeth's mother being present during those parties with Mr. Frawley being "more in the background."

---

[4]  The prosecution has listed Cathcart, Infante, and Martinez as witnesses for its penalty phase against defendant regarding an incident the day after the Husteds were killed in which petitioner allegedly punched Cathcart.

[5]  Frawley's current spouse, Linda Frawley, actively participated in Young Life as a committee member and eventually became co-chair in 2003, while petitioner was still involved in the organization.

According to Benscoter, she, Elizabeth, and their other girlfriends were "totally comfortable around" petitioner. She described him as a kind, protective "gentleman," who flirted with them in a "silly, goofy way that was endearing to all of us."

One of the exhibits attached to the motion to recuse was a defense investigator's report of an interview with Kyle Frawley, a report that had been reviewed, corrected and signed by Kyle.[6] According to the report, during the interview Kyle described petitioner as behaving appropriately at Young Life gatherings and stated that petitioner "was aggressive, but not in a bad way." On one occasion during a snowboarding trip, Kyle stayed with petitioner in a cabin that was "attacked" in a pillow fight by members of another cabin. According to Kyle, petitioner was the first person in the cabin to defend their cabin against the attack. In addition, during a Young Life camping trip, Kyle described a night in which petitioner declared that he had made a "breakthrough and accepted religion," accepting Jesus for the first time in his life. Kyle recalled petitioner being at the Frawley home for a Young Life meeting. Kyle also remembered that petitioner had attended his younger sister Elizabeth's birthday party at the Frawley home, although Elizabeth had not invited him. Kyle acknowledged that he was among a group of people who signed up on a Prayer for Josh Web site offering support for petitioner following his arrest in the underlying proceedings.

Petitioner's motion also included copies of numerous photographs taken during a Young Life camping trip featuring group photos of petitioner, Kyle,

---

[6] According to the defense investigator, Kyle reviewed the typed report, made minor handwritten changes to it, and signed the report. Although Kyle did not sign the report under penalty of perjury (Code Civ. Proc., § 2003), the prosecution lodged no objection to the trial court's consideration of any part of this statement.

9

Elizabeth, Benscoter, Cathcart, Infante, and Martinez. In some of these photos, petitioner is posing with Elizabeth and Benscoter or is lying across the lap of Elizabeth and Benscoter. One photo had been posted to a MySpace page run by Elizabeth, Benscoter, and a mutual friend who also had participated in Young Life.

In its opposition to the recusal motion, the prosecutor submitted his own report of an interview of Kyle conducted by a prosecution investigator after Kyle's interview with the defense investigator. The prosecution investigator's report is not signed by Kyle, but the defense lodged no objection to the trial court's consideration of this report for purposes of the section 1424 motion. According to the prosecution investigator's report, Kyle told the prosecution investigator that he (Kyle) had felt pressured to sign the defense investigator's report of his prior interview and that he did not want to testify in court about this case. Despite the fact that Kyle had reviewed the defense investigator's report and had made a few handwritten changes to that report, the prosecution investigator's report states that Kyle did not believe the defense report was accurately written, but rather was "slanted." According to the prosecution investigator's report, during the prosecution investigator's interview Kyle described petitioner as having a reputation for fighting. Kyle stated that petitioner was "overly aggressive" in the pillow fight Kyle had previously described to the defense investigator, characterizing it as the most "brutal" pillow fight Kyle had ever seen. The prosecution investigator's report states that Kyle remembered petitioner attending most of the weekly Young Life meetings during the 2004-2005 school year, along with Infante and Benscoter. According to the prosecution investigator's report, Kyle made clear that he and petitioner were not "personal friends," but just acquaintances. The prosecution investigator's report also stated that petitioner did not tell Kyle personally that he had accepted Jesus; instead petitioner had made

that statement in a group discussion. The prosecution investigator's report does not indicate that during the interview the investigator asked Kyle, or that Kyle mentioned, anything about his sister Elizabeth. Finally, the investigator's report discloses that Frawley was present in the room during his son's interview with the investigator.

According to the district attorney's opposition, at least 56 other children participated in Young Life with petitioner. The opposition maintained that because these other individuals might have known petitioner better than Frawley's children, Frawley's children were not important or critical witnesses for the defense penalty phase. The opposition claimed that the defense manufactured an apparent conflict by listing Frawley's children as possible witnesses. In his affidavit, Frawley states that his children's prior acquaintance with petitioner has not affected, impacted, or influenced any of his decisions in the present case. In a later supplemental filing, the prosecution stated its intention to have another deputy prosecutor cross-examine Kyle and Elizabeth should the defense call them as witnesses.

### C. Thomas Cathcart and His Relationship with Elizabeth, Petitioner, and Frawley

The trial court's rulings redacted much of the evidence the defense proffered concerning Cathcart's relationship with Elizabeth and Cathcart's interactions with the defense investigators. According to Benscoter's affidavit, Elizabeth and Cathcart had been romantically involved. Cathcart had been interviewed by investigators for both parties, but ultimately neither party submitted an affidavit by Cathcart in support of or in opposition to the recusal motion. The defense alleged that before Cathcart's interview with the prosecution was recorded, the prosecution's investigator advised him not to mention Elizabeth. According to defense counsel's affidavit, the prosecution's interview of Cathcart

11

was recorded and on that recording there is no reference to Elizabeth or to Cathcart's relationship with her.

According to Frawley's affidavit, Cathcart and petitioner were friends and played football together in high school. Frawley's children knew Cathcart, but he could not confirm whether Cathcart and Elizabeth had a dating relationship. Frawley admitted to being present when the prosecutor's investigator interviewed Cathcart. In their opposition, the prosecution denied the defense claim that Cathcart was told not to mention Elizabeth during the recorded part of the interview. According to the prosecution, "there was no professional reason to ask Mr. Cathcart about Elizabeth Frawley." Later in the same motion, however, the prosecution acknowledged that "Mr. Cathcart was told his interview with the prosecution investigator would not include information about Elizabeth Frawley." But the motion further stated that Cathcart "was never admonished to keep that relationship a secret."

### D. The Prosecutor's Alleged Interference with the Defense Investigation

Petitioner's investigators failed in numerous attempts to contact Elizabeth and petitioner claims that the prosecutor actively frustrated the defense's ability to contact her. During the time petitioner's recusal motion was being litigated, Elizabeth was a college student in South Bend, Indiana. According to Frawley's affidavit, he provided the defense with "the name of the state [in which] my daughter resides," and he gave Elizabeth the name and telephone number of the defense investigator.

Elizabeth did not contact the defense investigator. On May 30, 2012, a "tweet" on Elizabeth's Twitter account stated, "landing in LAX Aug 4-18." On

August 6, 2012, a tweet on Elizabeth's twitter account stated, "really over not being able to tweet my whereabouts.  This better pay off.  #attorneyfatherprobs."[7]

On August 13, 2012, a defense investigator delivered a subpoena for Elizabeth that was to be served by the Ventura County Sheriff's civil unit at the Frawley residence.  On August 17, 2012, however, Deputy Scott Baugher returned the subpoena to the defense, stating that the service on Elizabeth had failed and marked off a box indicating that "[t]he person has moved and the forwarding address is not known."  Deputy Baugher listed only one attempt to serve Elizabeth with the subpoena.

According to a defense investigator's report dated in late August 2012,[8] a defense investigator spoke with Deputy Baugher about the failed service. According to the defense investigator, Deputy Baugher appeared agitated and told him that the obligation to serve the subpoena had "put the department in a huge bind" and that the investigator should have informed the sheriff's department that the subpoena was for the daughter of a "high official" in the district attorney's office.  According to the defense investigator's report, Deputy Baugher said that the defense had put him "in danger" and that they were "playing games" by trying to make Frawley's children witnesses in the case.  Deputy Baugher told the defense investigator that he tried to serve the subpoena three times, and then conducted his own investigation and learned that the address was the residence of

---

**7**      The latter portion of the tweet, "#attorneyfatherprobs," is called a "hashtag."  This is a method by which a user can categorize his or her tweets by subject for other Twitter users to comment on.  Thus, by adding the hashtag, "#attorneyfatherprobs," the user presumably intended to create a topic on Twitter regarding problems with attorney fathers that others may view, approve, disapprove, and/or comment on.

**8**      The trial court did not redact this defense investigator's report and found it admissible as prior inconsistent statement of Deputy Baugher.

Michael Frawley of the district attorney's office. Deputy Baugher indicated that he had subsequently telephoned the residence and had spoken with Frawley himself, Frawley said that Elizabeth no longer lived there and that he did not know where his daughter lived.

In late October 2012, another defense investigator asked Deputy Baugher to sign an affidavit derived from the contents of the late August 2012 defense investigator's report. Deputy Baugher reviewed both the late August report and the defense-drafted affidavit, but refused to sign the affidavit.

Frawley later presented an affidavit from Deputy Baugher. In this affidavit, Deputy Baugher stated that he was assigned to serve a subpoena for Elizabeth and that he determined that the address listed for her was the same as the address for Chief Deputy District Attorney Frawley. Deputy Baugher then called Frawley who stated that Elizabeth was an adult and no longer lived at his residence. According to Deputy Baugher's affidavit, "[i]t is not my practice to inquire about forwarding addresses and I did not do so when I spoke with Mr. Frawley." Deputy Baugher denied telling the defense investigator that Frawley claimed not to know Elizabeth's current address. In his affidavit, Deputy Baugher explained that he told the defense investigator that she should have informed him that the address listed in the subpoena was for an official in the district attorney's office because, in his experience, "persons involved in law enforcement often own firearms and for that reason not knowing Mr. Frawley's position could have created an unsafe situation." Deputy Baugher denied telling the defense investigator that the defense was "playing games," and explained that he did not sign the defense-drafted affidavit because it did not reflect his recollection of the events described.

14

Although Thomas Cathcart had previously cooperated with the defense, by November 2012, Cathcart refused further attempts by the defense to contact him or to review and sign a draft affidavit.

In his affidavit, Frawley stated that he never interfered with the defense efforts to interview his children. Frawley also stated that he told his children that they should feel free to speak with the defense.

### E. The Prosecutor's Personal Interest in Not Having His Children Testify

Petitioner contends that the prosecutor has a personal and emotional bias in the noninvolvement of his children in the penalty phase — to prevent his children from being maligned by their association with a triple murderer. As evidence of this bias, petitioner points to the prosecutor's statements to the press, his motions to strike evidence presented in petitioner's motion to recuse, and his litigation of various discovery issues.

In late July 2012, approximately one week before the initial date set for trial, the defense filed a revised witness list listing Kyle and Elizabeth Frawley as witnesses for the defense penalty phase. In response, the prosecutor sent defense counsel an e-mail in which he complained of the late discovery and requested any witness reports and the contact information for some of the proposed defense witnesses, including his own children. Defense counsel responded in an e-mail to the prosecutor the next day, explaining that the defense would provide its witness reports and contact information in the coming days. Although the parties were aware of an impending defense motion for a continuance, Frawley filed a motion seeking to hold defense counsel in contempt for providing untimely discovery.

The trial court granted the defense's request for continuance and delayed the trial for five months. After this hearing, the prosecutor told a reporter for a local newspaper that his "children have nothing to do with this case" and that they

15

would not have been mentioned if he was not the prosecutor. When asked about his children's association with petitioner in the Young Life group, the prosecutor told the reporter, "I am not going to answer specific questions about that but it's probably the lowest sort of trial tactics I've ever seen."

A few days later, soon after the "really over not being able to tweet my whereabouts" message on Elizabeth's Twitter account, the prosecutor served a subpoena duces tecum on defense counsel's office seeking materials related to the subpoenas of defense witnesses. At a trial court hearing, defense counsel argued that a subpoena duces tecum was a mechanism for obtaining discovery from third parties, not from an opposing party, and that its use would circumvent the reciprocal discovery statutes. In response, the prosecutor stated that the request sought information concerning when the defense actually anticipated calling these witnesses at trial and that this factor would be useful for the court in deciding a future motion for contempt based on providing untimely discovery. In his affidavit, the prosecutor explained that he believed that the defense had delayed its disclosure of its witnesses "in order to gain tactical advantage." He further declared that he filed the motion to hold defense counsel in contempt and for no other reason. In his affidavit, Frawley does not explain why he utilized a subpoena duces tecum to seek discovery from defense counsel's office.

Additionally, the prosecutor filed motions to strike various portions of the defense's affidavits and investigation reports. Taken together these motions sought to exclude all portions of Benscoter's statements that described Elizabeth's romantic relationship with Thomas Cathcart, that Benscoter, petitioner, and other Young Life participants had been at the prosecutor's residence "all the time," including attending parties that were unrelated to Young Life events, and that Benscoter and Elizabeth felt comfortable around petitioner, enjoyed his company, and that he was protective of them. Last, the prosecutor objected to the

16

introduction of the message, "really over not being able to tweet my whereabouts" that had appeared on Elizabeth's Twitter account, arguing that "there has been no showing that the 'tweet' can be attributed to Elizabeth Frawley."

In addition, the prosecutor stated in his affidavit that all of his decisions in this case "have been made in the usual and customary manner" and that he had not made any decision under the influence of the allegations of the recusal motion or under any "extraordinary or unusual pressure." The prosecutor further explained that his relationship with his adult children would not cause him to exercise his "discretion and professional duties differently" than if they had never met petitioner.

## III. DISCUSSION

### A. Applicable Legal Standards for a Motion to Recuse

Section 1424, subdivision (a)(1) provides, in part, that a motion to recuse the district attorney "may not be granted unless the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial."

In interpreting this section, we have held that a "conflict" exists, for purposes of section 1424, "whenever the circumstances of a case evidence a reasonable possibility that the DA's office may not exercise its discretionary function in an evenhanded manner." (*People v. Conner* (1983) 34 Cal.3d 141, 148.) Moreover, "there is no need to determine whether a conflict is 'actual,' or only gives an 'appearance' of conflict." (*Ibid*.)

However, the mere existence of a conflict, by itself, is not sufficient to require recusal of the district attorney. (*People v. Eubanks* (1996) 14 Cal.4th 580, 594.) Section 1424 does not authorize disqualification merely because the defense has shown that the prosecutor's involvement "would be unseemly, would *appear*

17

improper, or would tend to reduce public confidence in the impartiality and integrity of the criminal justice system." (*Id*. at p. 592.) Instead, it is defendant's burden to allege facts which, if credited, establish: (1) a "conflict of interest"; and (2) that the conflict is "so grave as to make a 'fair trial' unlikely." (*Id*. at p. 593.) "Thus, the first half of the inquiry asks only whether a 'reasonable possibility' of less than impartial treatment exists, while the second half of the inquiry asks whether any such possibility is so great that it is more likely than not the defendant will be treated unfairly during some portion of the criminal proceedings." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 713.)

As previously described, the statutory procedure established by section 1424 prescribes a two-stage process. At the first stage, the defendant must file a notice of motion containing "a statement of the facts setting forth the grounds for the claimed disqualification and the legal authorities relied upon by the moving party," and those allegations must be supported by "affidavits of witnesses who are competent to testify to the facts set forth in the affidavit." (§ 1424, subd. (a)(1).) In opposition to the motion, the district attorney and the Attorney General may also file affidavits. (*Ibid.*) After considering the motion and affidavits, the trial court then decides whether or not the second stage, an evidentiary hearing, is necessary. (*Ibid*.) An evidentiary hearing may be ordered if the defendant's affidavits establish a prima facie case for recusal — that is, if the defendant's affidavits, if *credited*, would require recusal. (*Spaccia*, *supra*, 209 Cal.App.4th at p. 112.)

The decision whether to hold an evidentiary hearing "contemplates an exercise of discretion on the part of the trial court in determining whether a hearing is necessary," and we review a trial court's decision not to hold an evidentiary hearing for an abuse of that discretion. (*Spaccia*, *supra*, 209 Cal.App.4th at p. 109.) We have explained that, under this standard of review,

18

"[t]he trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court*, *supra*, 43 Cal.4th at pp. 711-712, fns. omitted.) The same standard applies in capital cases. (*Hollywood v. Superior Court* (2008) 43 Cal.4th 721, 728.)

In *Spaccia*, the Court of Appeal examined the legislative history of section 1424, which at one point contained language that limited evidentiary hearings to the sole circumstance of when " 'there are disputed issues of material fact that cannot be resolved through the use of affidavits.' " (*Spaccia*, *supra*, 209 Cal.App.4th at p. 109, quoting Assem. Bill No. 154 (1999–2000 Reg. Sess.) as introduced Jan. 15, 1999, p. 2, italics omitted.) But as enacted, the evidentiary hearing provision of section 1424 simply states: "The judge shall review the affidavits and determine whether or not an evidentiary hearing is necessary." (§ 1424, subd. (a)(1).) The Court of Appeal in *Spaccia* concluded that because "the language limiting hearings was ultimately *rejected in favor* of language leaving the issue of whether to hold a hearing to the trial court's discretion, we can infer that the Legislature expressly chose *not* to limit evidentiary hearings to only those situations in which there exist disputed issues of material fact which could not be resolved on affidavits alone." (*Spaccia*, *supra*, at pp. 110-111.)

Thus, it is clear that the Legislature intended that trial courts exercise broad discretion in deciding whether to hold evidentiary hearings under section 1424.

### B. Application to This Case

In the present case, the prosecution conceded that an apparent conflict existed because the prosecutor's children are on the defense witness list, but argued that the defense had "manufactured" the apparent conflict.

19

The trial court accepted the prosecution's concession that petitioner had demonstrated an apparent conflict of interest because the prosecutor's children did have "some degree of relationship" with petitioner and that they "may very well have positive" mitigating penalty phase evidence "that will be admissible" at trial. But the trial court concluded that petitioner had failed to show "a disabling conflict of interest" because, in the court's view, "[t]here is a lapse in the link between the apparent conflict, conflict, and unfairness on behalf of the prosecution." The court further stated that petitioner's submissions had raised only "speculation and innuendo" and that "the court is not going to allow an evidentiary hearing to support the allegations made at this stage of the proceedings."

In reviewing the trial court's ruling, the Court of Appeal held that that court had not abused its discretion. The Court of Appeal did not find a disabling conflict based on the fact that the prosecutor's children might become witnesses in the penalty phase. It reasoned that the prosecution would likely not contest the prosecutor's children's credibility, but instead would question the significance of their testimony on the question of whether death is the appropriate penalty for petitioner. The Court of Appeal also found petitioner's affidavits disclosed no conflict of interest on the part of the prosecutor relating to Cathcart. It concluded that there was no reason why Cathcart's prior relationship with the prosecutor's daughter would cause the prosecution to treat petitioner unfairly. In addition, the Court of Appeal concluded that the trial court did not abuse its discretion in finding no disabling conflict arising from the prosecutor's minimal links to the Junior League organization that victim Davina Husted had managed in various capacities. On each of these points, we agree with the Court of Appeal that the trial court did not abuse its discretion in finding that denial of the recusal motion was warranted without an evidentiary hearing.

20

We disagree, however, with the lower court rulings that no evidentiary hearing was warranted concerning the more substantial issue of whether the prosecutor had become so personally involved in the case " ' " 'as to render it unlikely that [petitioner] will receive fair treatment during all portions of the criminal proceedings." ' " ' (*Haraguchi v. Superior Court*, *supra*, 43 Cal.4th at p. 713.) In the Court of Appeal's view, petitioner "presented no direct evidence that the prosecutor had any role in Elizabeth's, Kyle's, Cathcart's or the prosecution investigator's conduct" or that the prosecutor's actions were motivated by a personal grievance against petitioner. The Court of Appeal acknowledged that the trial court "could have reasonably inferred that the prosecutor was upset with [petitioner] and was grinding that personal axe by tampering with witnesses and taking positions in pretrial litigation unhelpful to the defense." But the Court of Appeal further observed that "the trial court could also reasonably infer that the prosecutor's litigation positions were zealous but evenhanded discretionary calls, that the prosecutor had nothing to do with the witnesses' reluctance to fully cooperate with either party, and that the prosecutor's statements constituted public posturing in a high-profile case rather than an admission of a personal vendetta." The Court of Appeal concluded that it could not take issue with "the trial court's decision to draw one reasonable inference over another," relying in part on language in a prior decision of this court stating that the trial court "is in a 'better position' than we are to 'evaluate the consequences of a potential conflict in light of the entirety of a case.' " (*Ibid*.)

However, we believe that on the facts of this case the trial court's choice of one inference over another was improperly made without hearing testimony, evaluating credibility, and resolving factual disputes that were key to determining the relative reasonableness of the alternative inferences raised by the parties' affidavits. An evidentiary hearing would address questions concerning whether

21

the defense had manufactured a conflict, questions concerning defense discovery tactics, the prosecutor's pretrial conduct, the effect — if any — of Frawley's role as a prosecutor upon his children's potential penalty phase testimony, and the gravity of the prosecutor's conflict — if any — as it related to the fairness of petitioner's trial.

There were at least four significant factual disputes that, if resolved in petitioner's favor, could show that the conflict was so grave as to make a fair trial unlikely.

First, there was a factual dispute concerning how frequently petitioner visited the prosecutor's home to socialize with Elizabeth Frawley and her friends. According to the affidavit of Kristy Benscoter, petitioner was at the Frawley residence "all the time" with her, Elizabeth, and their other friends, and they all enjoyed his company. This is in contrast to Frawley's statements that petitioner had been to his residence only on "two or more occasions" and that he did not want to convey "the impression that there was actually a relationship" between petitioner and his children. The nature and closeness of the relationship between petitioner and the prosecutor's children would certainly have a bearing on the gravity of the prosecutor's conflict of interest as it related to his adult children's potential penalty phase testimony.

Second, there is a factual dispute concerning whether the prosecution's investigator told Thomas Cathcart, before their interview, that he should not mention Elizabeth. The prosecutor was in the room during the recording of the interview, and, in that interview, Cathcart does not mention Elizabeth. Although the district attorney's opposition to the recusal motion denied the defense's assertion that Cathcart was told not to mention Elizabeth, the district attorney's opposition itself lends some credence to the defense claim by explicitly acknowledging that "Mr. Cathcart was told his interview with the Prosecutor

22

would not include information about Elizabeth Frawley."  Under the circumstances, an evidentiary hearing would shed light on whether the prosecutor used his influence to steer the prosecution investigator's interview with Cathcart to minimize his daughter Elizabeth's connection with petitioner and his friends.

Third, there was a clear factual dispute concerning whether the prosecutor had interfered with service of a subpoena on Elizabeth:  The defense claimed the prosecutor refused to provide the process server with Elizabeth's current address. According to the affidavit of the process server, he did not ask Frawley for Elizabeth's current address.  In contrast, according to a defense investigator, the process server told the defense investigator that he had asked Frawley for Elizabeth's current address, but Frawley said he did not know it.[9]

Finally, there was a conflicting depiction of petitioner's character and background in the reports of Kyle's interviews with defense and prosecution investigators.  In his interview with the defense investigator, Kyle described petitioner in generally favorable terms.  The defense investigator allowed Kyle to review the report and make changes, which he did.  In contrast, in Kyle's interview with the prosecution investigator, at which Kyle's father was present, Kyle largely disavowed the defense investigator's report and described petitioner

---

[9]     In its brief, amicus curiae, the California District Attorneys Association, specifically recognizes this factual conflict, yet maintains that "the lack of an evidentiary hearing with live testimony did not deny petitioner anything in terms of presenting to the court the content of the supposed inconsistent statements." But, in a similar scenario in which a petitioner on habeas corpus has the burden of proving entitlement to relief, we have recognized that "the reason we require habeas corpus petitioners to prove their disputed allegations at an evidentiary hearing, rather than merely decide the merits of the case on declarations, is to obtain credibility determinations." (*In re Scott* (2003) 29 Cal.4th 783, 824.)  By failing to hold an evidentiary hearing, the trial court failed to make any credibility determinations in support of its ruling.

in generally negative terms. The stark conflict between the two reports and the circumstances of the interviews should have caused the court to hold a hearing to determine whether the prosecutor exercised undue influence over the potential witness.

The trial court neither acknowledged these factual disputes nor resolved them in its ruling. The trial court failed to make any credibility findings concerning these disputes. Given the material factual disputes here and the inconsistencies in affiants' statements, it seems apparent that this motion could not be resolved without live testimony. These disputes, if resolved in petitioner's favor, would lend credence to the defense claim that Frawley had actively interfered in the defense's pretrial ability to contact Elizabeth and discover whether she could offer significant mitigating evidence at petitioner's penalty phase. In assessing the likelihood of prejudice stemming from an asserted conflict of interest under section 1424, we consider "the conflict's effect on 'the DA's *discretionary powers exercised either before or after trial.*' " (*People v. Eubanks*, *supra*, 14 Cal.4th at p. 593, quoting *People v. Conner*, *supra*, 34 Cal.3d at p. 149.) A prosecutor's use of his or her position to attempt to unfairly interfere with the defense's pretrial efforts to investigate a potentially significant penalty phase witness would be a genuine disabling conflict, especially when that witness is the prosecutor's child.

To be sure, the defense's initial decision to single out the prosecutor's children as potential penalty phase witnesses on petitioner's behalf could reasonably be viewed, from one perspective, as simply a disingenuous effort on the part of defense counsel to create a conflict where none otherwise existed. We have no doubt that a trial court would have discretion to deny a motion to recuse a district attorney that was proffered on behalf of a criminal defendant whose counsel engaged in improper gamesmanship by proposing to call only marginally

24

relevant witnesses who have a strong personal connection to the prosecutor simply as a means of creating a conflict for purposes of section 1424.

In this case, however, defense counsel maintained that there were legitimate reasons for choosing Kyle and Elizabeth as penalty phase witnesses: they were more likely to be viewed as without bias in favor of petitioner than other Young Life members and thus a jury would more likely be favorably impressed by their testimony regarding petitioner's character and background. Under the circumstances, we do not believe the trial court could dismiss defense counsel's conduct as simply impermissible gamesmanship without an evidentiary hearing. Moreover, as the defense investigation proceeded, the accumulating affidavits increasingly indicated that Elizabeth and petitioner had been friends for a sustained period and that she might offer significant favorable mitigating evidence concerning petitioner's background and character at the penalty phase, if the trial proceedings reached that stage.

Furthermore, as the defense made further efforts to learn more details of Elizabeth's relationship with and attitude toward petitioner, other evidence surfaced suggesting that Frawley may have actively encouraged Elizabeth not to cooperate with the defense or otherwise thwarted their access to her.

Particularly significant in this regard was the tweet on Elizabeth's Twitter account in which she claimed to be "really over not being able to tweet [her] whereabouts. This better pay off. #attorneyfatherprobs." This message could reasonably support the inference that Elizabeth had been directed not to disclose her whereabouts because her concealment would "pay off" for her attorney father.

Moreover, even if an evidentiary hearing shows that Frawley played no role in his daughter's refusal to cooperate with the defense, it could be inferred that Elizabeth's refusal to speak with the defense was motivated by her father's capacity in prosecuting the matter, inasmuch as any testimony by her favorable to

25

petitioner might adversely affect her father's interest, as lead prosecutor, in seeking the death penalty against petitioner. The same can be said of Kyle. In either scenario, Frawley's continuing role as lead prosecutor in this matter could have the effect of interfering with the defense's ability to present relevant and potentially significant mitigating evidence at the penalty phase of this capital case.

Additionally, should Frawley's children become defense witnesses at the penalty phase, it is not speculative to worry that his personal knowledge of his children's interactions with petitioner might influence the jury's assessment of their testimony. Presumably, the prosecutor would take care not to convey his knowledge of facts outside the record during cross-examination or closing statements. Nonetheless, one or more jurors might infer that any attempt to dispute the children's testimony or limit its significance is based in part on personal knowledge stemming from their close personal relationship. At the very least, these prospects bear on whether the prosecutor should be recused.

The People argue that there are other persons from the Young Life group who are more familiar with petitioner and would make ample alternative witnesses in mitigation for petitioner at any penalty phase. But the district attorney and Attorney General submitted no affidavits from any such alternative witnesses to support that assertion. Moreover, because the defense was not able to interview Elizabeth or to question her at an evidentiary hearing to learn the extent of any mitigating evidence she might have to offer, it is impossible to make any relative comparisons with the testimony that might be presented by other potential witnesses. An evidentiary hearing might well reveal that Kyle and Elizabeth have little significant mitigating evidence to offer or that their cooperation and testimony would not be affected by the relationship with their father, and thus diminish the potential gravity of the conflict. But we believe that the trial court erred in dismissing the prospect of any actual likelihood of unfairness without

26

holding an evidentiary hearing to obtain the relevant testimony and resolve issues of credibility that are necessary to evaluate petitioner's concerns.

There may well be some scenarios in which judicial economy would justify a trial court's decision not to hold an evidentiary hearing under section 1424 when the allegations contained in an affidavit lack credulity on their face. For example, a trial court may reasonably deny a motion under section 1424 without an evidentiary hearing if the record as a whole conclusively resolves an assertedly disputed fact or the defendant's factual allegations are entirely without credibility.

But here petitioner presented plausible evidence suggesting that the prosecutor's personal entanglement in the case had interfered with and was likely to continue to interfere with the defense's ability to investigate and present potentially significant mitigating evidence. Under these unique circumstances, the credibility of petitioner's evidence cannot be determined without an evidentiary hearing to examine the disputed facts, which if resolved in petitioner's favor, would entitle him to relief under section 1424. The full extent of Elizabeth's relationship with petitioner, the issue of whether the prosecution had advised Cathcart not to mention Elizabeth at the prosecutor's behest, and whether the prosecutor influenced Kyle's potential testimony or actively engaged in thwarting the defense's effort to subpoena Elizabeth are all serious factual disputes that will illuminate the gravity of the conflict at issue here.

It is not difficult to understand and to sympathize with a parent's strong inclination to protect his or her children from being drawn into the role of witness in a death penalty case, and a prosecutor who is a parent is, of course, not immune from such feelings. At the same time, however, a criminal defendant's right to present potentially favorable witnesses on his behalf is a fundamental right — a right that takes on added significance in the capital setting. In light of the affidavits submitted in support of and in opposition to petitioner's motion to

27

recuse the prosecutor under section 1424, and the conflicts and contradictions reflected in those affidavits, we conclude that the trial court abused its discretion in declining to hold an evidentiary hearing. A hearing was necessary to determine whether the conflict in this case would render it unlikely that petitioner would receive a fair trial if the prosecutor is not recused as lead prosecutor in the underlying proceeding.

## IV. DISPOSITION

We reverse the judgment of the Court of Appeal and order the appellate court to issue a writ of mandate to the trial court directing that court to conduct further proceedings consistent with this opinion.

**CANTIL-SAKAUYE, C. J.**

**WE CONCUR:**

**BAXTER, J.**
**WERDEGAR, J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**WOODS, J.\***

_____

\*      Associate Justice of the Court of Appeal, Second Appellate District, Division Seven, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

28

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Packer v. Superior Court

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 219 Cal.App.4th 226
**Rehearing Granted**

_____

**Opinion No.** S213894
**Date Filed:** December 11, 2014

_____

**Court:** Superior
**County:** Ventura
**Judge:** Patricia M. Murphy

_____

**Counsel:**

Stephen P. Lipson, Public Defender and Michael C. McMahon, Chief Deputy Public Defender, for Petitioner.

No appearance for Respondent.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Zee Rodriguez, Deputy Attorneys General; Gregory D. Totten, District Attorney, and Michelle J. Contois, Deputy District Attorney, for Real Party in Interest.

Mark L. Zahner and Albert C. Locher for California District Attorneys Association as Amicus Curiae on behalf of Real Party in Interest.

1

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Michael C. McMahon
Chief Deputy Public Defender
800 South Victoria Avenue
Ventura, CA 93009
(805) 477-7114

Steven D. Matthews
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 897-2367

Michelle J. Contois
Deputy District Attorney
800 South Victoria Avenue, Suite 314
Ventura, CA 93009-2730
(805) 654-3078

2