Filed 8/29/17
Reposted to provide correct version

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> MICHAEL VASQUEZ, <br><br> Defendant and Appellant. | D069298 <br><br><br> (Super. Ct. No. SCS266196) |

APPEAL from a judgment of the Superior Court of San Diego County, Dwayne Moring, Judge. Reversed.

Carl J. Fabian, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Lynne G. McGinnis and Kristine Alton Gutierrez, Deputy Attorneys General, for Plaintiff and Respondent.

I.

INTRODUCTION

"[D]emonstrative evidence [is] offered to help a jury understand expert testimony or other substantive evidence . . . ."  (*People v. Duenas* (2012) 55 Cal.4th 1, 20 (*Duenas*).)  Demonstrative evidence is "not offered as substantive evidence, but as a tool to aid the jury in understanding the substantive evidence."  (*Id.* at p. 25.)

In this case, during the prosecutor's redirect examination of an alleged child molestation victim (P.C.), the trial court permitted the People to display to the jury an approximately twenty-foot long "timeline" of the alleged molestations that a therapist created with P.C. in preparation for a prior proceeding in this case.  The timeline contained detailed statements describing the alleged abuse written by the therapist at P.C.'s direction, together with dates and photographs of P.C. at various ages.[1]  The court also permitted the prosecutor to directly question P.C. at trial about statements contained on the timeline.

On appeal, defendant Michael Vasquez contends that the trial court erred in permitting the jury to view the timeline and erred in admitting the related testimony.  The People contend that the timeline was properly displayed to the jury as demonstrative evidence akin to a "map[ ], chart[ ], [or] diagram[ ] . . . ."  (Quoting *People v. Mills* (2010) 48 Cal.4th 158, 207 (*Mills*).)  The People further argue that the court "properly

---

[1]     We have included photographs of the timeline contained in the record on appeal in part III.A.1.b, *post*.

allowed P.C. to directly explain some of the things shown on the timeline so the jury would understand what they were seeing."

We conclude that the trial court committed clear error in permitting the jury to view the timeline and allowing P.C. to read statements from the timeline into evidence. The timeline did not constitute demonstrative evidence that could properly be displayed to the jury in order to assist the jury in its understanding of P.C.'s testimony. Rather, the timeline contained inadmissible out-of-court statements that were improperly offered for their truth and to bolster P.C.'s credibility.

The error requires reversal of Vasquez's molestation convictions. To begin with, a prior trial resulted in a mistrial after the jury was unable to reach a verdict. The evidence presented to the juries at both trials was similar, with the notable exception that the timeline was presented only to the jury at the trial that resulted in the guilty verdicts.[2] Further, this case was essentially a credibility contest between the victims[3] and Vasquez, and the defense presented evidence from which a reasonable jury could find that the victims had a motive to fabricate the allegations.[4] Finally, the prosecutor prominently featured the highly inflammatory timeline during his closing argument, displaying it to the jury, making repeated reference to it, and urging the jury to rely on it as substantive

---

[2] The reporter's transcript from the prior trial is contained in the record on appeal.
[3] P.C.'s sister, E.C., testified that Vasquez had also molested her.
[4] We emphasize that we do not intend to suggest that this court believes that the victims lacked credibility. Rather, we observe only that the defense presented evidence from which a reasonable jury could find that the victims had a motive to fabricate the allegations.

evidence.  Under these circumstances, we are compelled to reverse the judgment and remand the matter for a new trial.[5]

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A.  *Factual background*[6]

    1.  *The People's evidence*

        a.  *Vasquez's sexual abuse of E.C.*

Vasquez began living with Patricia J. (Patricia) and her two daughters, E.C. and P.C., in mid-2004 or early 2005.  When Vasquez moved in, E.C. was approximately nine years old and P.C. was approximately five or six years old.[7]  The family lived together in a one-bedroom mobile home until September 2009.

---

5    In part III.B, *post*, of the opinion, we reject Vasquez's claim that he is entitled to a dismissal of the charges against him or recusal of the district attorney's office based on an alleged conflict of interest between the district attorney's office and the victim's family.

    In light of reversal of the judgment, we need not consider Vasquez's claim that the trial court failed to provide a proper unanimity instruction to the jury.  However, we briefly address this issue in part III.C, *post*, of the opinion in order to provide guidance to the trial court on remand.  We need not, and do not, address Vasquez's contention that he is entitled to a new sentencing hearing because the record does not reflect that the trial court was aware of a change in the law applicable to Vasquez's sentence.

6    We state the facts in the light most favorable to the judgment in this section.  (See, e.g., *People v. McGehee* (2016) 246 Cal.App.4th 1190, 1195).  However, in part III.A.4, *post*, in assessing whether the trial court's error in permitting the jury to view the timeline was prejudicial, we consider the weight of the evidence.  (See, e.g., Eisenberg et al., Cal. Practice Guide, Civil Appeals and Writs (The Rutter Group 2016) ¶ 8:301["the appellate court will *consider the weight of the evidence* in making its prejudicial error analysis"].)

7    E.C. was born in 1995, and was 20 years old at the time of trial.  P.C. was born in 1998 and was 16 years old at the time of trial.

E.C. would often crawl into bed with Patricia and Vasquez during the night or in the morning. When Patricia would get up, E.C. would stay in bed alone with Vasquez. During this time, Vasquez would often hug E.C. from behind. On several occasions, Vasquez touched E.C.'s breasts underneath her shirt and training bra, and grabbed and pulled her nipples. E.C. would pretend to be asleep. On some of these occasions, E.C. could feel Vasquez's erect penis. E.C. felt scared and uncomfortable and stopped going into Patricia and Vasquez's bed.

b. *Vasquez's sexual abuse of P.C.*

P.C. would also occasionally crawl into Patricia and Vasquez's bed, and would stay in the bed with Vasquez after Patricia left. When P.C. was five or six years old, Vasquez would rub her thighs when she was alone in bed with him. When P.C. was in second or third grade and around seven years old, Vasquez also began touching P.C.'s breasts and the outside of her vagina under her clothing.

By the time that P.C. was in fifth or sixth grade, Vasquez would insert his fingers inside her vagina. Sometimes the penetration would hurt, and P.C. would tell him to stop. Also while P.C. was in fifth grade, Vasquez would rub his penis against P.C.'s vagina with her pants off. Occasionally, Vasquez would ejaculate while doing this. Vasquez also would kiss or lick P.C.'s vagina. P.C. also began touching Vasquez's penis, causing it to become erect. The molestations took place frequently, often on weekends when Patricia was not home.

As P.C. got older, she became "grossed out" by the molestations. The incidents of abuse decreased until they stopped altogether around the time P.C. was in eighth grade.

5

### c. *E.C. tells Patricia that she witnessed Vasquez molesting P.C.*

When the girls were young, Vasquez would frequently play a game called "Claws" with them. Vasquez would pretend to be a bear or monster, chase the girls, and tickle them. One time while Vasquez was playing the game with the girls, E.C. went to the bedroom to get a pillow. When she returned to the living room, P.C. was lying on top of Vasquez. Vasquez was licking P.C.'s neck and kissing her, while trying to remove her clothing. E.C. threw the pillow at them and ran outside to wait for Patricia to come home. When Patricia came home, E.C. told her what she had witnessed. Patricia did not believe E.C. and disciplined her. E.C. estimated that she was 11 or 12 years old at the time of this incident.

### d. *P.C.'s disclosures of the abuse*

In late June or early July 2012, P.C. learned that Vasquez was threatening to have Patricia deported.[8] After learning of Vasquez's threats, P.C. told a friend that Vasquez had been sexually abusing her. P.C. was worried about Vasquez's threats, and asked the friend whether she should tell Vasquez "if you tell on my mom, then I'm going to say what you did to me."

P.C. called Vasquez and told him that she would disclose the abuse if Vasquez reported Patricia to immigration authorities.[9]

Shortly thereafter, P.C. told Patricia about the abuse and Patricia called the police.

---

[8] Patricia had been deported previously in 2009, but had returned to the country approximately a month to a month and a half later.

[9] P.C. could not recall whether she made this statement during a live conversation or in a voice message.

e. *Patricia's immigration status*

Approximately two weeks after Patricia called the police, immigration officials removed Patricia from her home. Approximately a year later, Patricia was removed from the country. Patricia remained outside of the country for four months. However, she was allowed to return to this country after applying for a visa that, according to Patricia, is used "when a crime happens on the family."

2. *The defense*

Vasquez testified in his own behalf and denied that he had ever engaged in any sexual activity with E.C. or P.C. Vasquez believed that the incident during which E.C. thought she saw him molesting P.C. happened in 2005. Vasquez claimed that he and P.C. were merely rolling around in clothing that Patricia had dumped on him after doing laundry.

Vasquez stated that there had been one occasion when he woke up with an erection while E.C. was in the bed. Vasquez claimed that he may have accidentally touched E.C.'s foot with his erection.

Vasquez told Patricia that he wanted a divorce in early 2012. At some point during the break up, Vasquez threated Patricia that he would "call immigration on her." Vasquez moved out of the family residence in July 2012.

Shortly thereafter, Vasquez received a telephone call from P.C. during which she accused him of having molested both her and E.C. Vasquez denied "everything." Vasquez later learned that the phone call had been recorded by the police. Vasquez also denied having molested either of the girls during a lengthy interview with police.

7

Several character witnesses testified on Vasquez's behalf, including Vasquez's former step-daughter, Michelle Wood. Vasquez moved in with Wood and her mother when Wood was 12 years old. Vasquez never engaged in any sexually inappropriate behavior with Wood. Vasquez and Wood's mother divorced when Wood was 17 years old.

3. *Rebuttal evidence*

A police detective recounted a pretext telephone call between Patricia and Vasquez. Vasquez told Patricia that on one occasion, P.C. had pulled his pants down while they were playing. Vasquez also told Patricia that E.C. was always touching him. Vasquez did not mention either of these events during his police interview.

B. *Procedural background*

The People charged Vasquez with eight counts of committing a lewd and lascivious act with a child under 14 years old (counts 1–8) (Pen. Code,[10] § 288, subd. (a)). Counts 1 and 2 named E.C. as the victim, and counts 3 through 8 named P.C. as the victim. The information further alleged that the offenses were committed against multiple victims (§ 667.61, subds. (b), (c), (e)).

The trial court held a jury trial on the allegations in January 2015. The jury was unable to reach a verdict, and the trial court declared a mistrial.

In October 2015, a second jury found Vasquez guilty of all counts and found the enhancement allegations true.

---

[10]    Unless otherwise specified, all subsequent statutory references are to the Penal Code.

The trial court sentenced Vasquez to an aggregate term of 120 years to life in prison. Vasquez timely appeals.

III.

DISCUSSION

A. *The trial court committed reversible error in permitting the People to display the timeline of the alleged abuse to the jury and allowing P.C. to testify as to statements on the timeline*

Vasquez claims that the trial court committed reversible error in permitting the People to display the timeline of the alleged abuse to the jury and allowing P.C. to testify as to statements contained on the timeline. "We review a trial court's evidentiary rulings for abuse of discretion." (*People v. Clark* (2016) 63 Cal.4th 522, 597.)

1. *Factual and procedural background*

a. *P.C.'s initial cross-examination*

During the trial, defense counsel cross-examined P.C. with respect to whether she had made various statements to investigators before the trial concerning her prior sexual activity with Vasquez and with others. For example, defense counsel asked P.C. whether she had told an investigating officer that she had had sex with "about seven boys." P.C. stated that she did not recall having made that statement.

P.C. did acknowledge on cross-examination that she had told forensic interviewers that she had given Vasquez a "blow job," while at trial, she denied having done so. P.C. explained that, at the time she spoke to the interviewer, she understood the term "blow job" to refer to, as defense counsel stated, "using your hand to masturbate the penis." P.C. also acknowledged that she told a forensic interviewer both that she had not had

9

sexual intercourse with Vasquez and that Vasquez had "raped" her. P.C. explained that "back then, I didn't know . . . the proper words for everything."

Toward the end of her first day of cross-examination, defense counsel asked P.C. whether she had testified that Vasquez had molested her at locations other than two of the family's residences. P.C. responded affirmatively. Defense counsel then asked P.C. whether she had told the forensic interviewers that Vasquez had molested her only at the two family residences. P.C. responded that she could not recall. Defense counsel asked P.C. whether she wished to refresh her memory by reviewing the transcript of her forensic interview. P.C. responded, "No. I don't want to look at it." After defense counsel again asked P.C. whether it would refresh her recollection to review the transcript of the interview, P.C. responded:

> "Like I told you, it's not going to be any different. I don't — if I did or not. [¶] Like I'm telling you, like whatever I did tell them, the investigator, the police, it was my first time like actually saying what happened. [¶] Like I'm not going to say everything correctly. I'm going to get mixed up. I was — I'm going to get mixed up with my words, what I used to explain myself."

Shortly thereafter, the court recessed the trial until the following day.

b. *The hearing on the timeline*

The following day, at a hearing outside the presence of the jury, the prosecutor informed the court that P.C. had arrived to court that morning with a "timeline" that P.C. and her therapist had prepared.[11] According to the prosecutor, the timeline was "several

---

11 The prosecutor explained, "The first time I saw [the timeline] was this morning, Your Honor."

10

feet long" and "detail[ed] [P.C's] recollection of the sexual interaction between her and Michael Vasquez, as well as the sexual interaction between her and other people leading up to July of 2012 [at which time she disclosed the abuse]."

The prosecutor stated that the timeline "would not be introduced as an exhibit," but contended that it could be used to refresh P.C.'s recollection. In addition, the prosecutor maintained that the timeline could properly be shown to the jury as a demonstrative exhibit. The prosecutor argued:

> "And, also, it's a demonstrative exhibit. It's demonstrative, I believe, for what her testimony has been and what her testimony will be by the time she completes her testimony. [¶] And as a demonstrative exhibit, it would be shown to the jury. It would not go, necessarily to the jury room. [¶] But an in-court demonstrative exhibit, although not evidence itself like a video or photograph might be, it's certainly useful to the trier of fact to determine credibility of the witness, accuracy of testimony and provides a chronology, written firsthand by the witness, of her experience."

Defense counsel responded by stating that he had not seen the timeline and that the court should hold an Evidence Code section 402[12] hearing. The court requested that the People retrieve the timeline so that it could be displayed in court outside the presence of the jury, to aid in the court's consideration of the issue.

Five photographs, which appear to capture the entirety of the timeline,[13] are contained in the record on appeal and appear below:

---

[12]  Evidence Code section 402 authorizes a trial court to determine the admissibility of evidence outside the presence of the jury.

[13]  We have altered the images of the timeline in two ways to protect the anonymity of E.C. and P.C. First, we have removed E.C.'s first name from the second image of the timeline that states, "Ask [E.C.]" and "[E.C.] - 6th grade 11 or 12 me 7 or 8 years old





when [E.C.] came in."  In addition, we have altered the school identification cards depicted on the timeline in order to protect P.C.'s identity.



confusion with

stuff
...ping –
...h clothes on

took me to Legoland

told window people
he had sex with me
because sex meant
something different to
me – dick rubbing chocha

2 way mirror interview

7th grade – had sex for
1st time with another boy
felt like I betrayed Michael
like a "Hoe"

touching really bad
rub his penis on my vagina
put fingers inside me – would hurt
hold me closer, slap my butt
felt like he "deserved it" – hand job

sometimes
– would tell
him to s...

2008

201...



...dow people
...with me
meant
...fferent to
...bing chocha

2 way mirror interview

7th grade – had sex for
1st time with another boy
felt like I betrayed Michael
like a "Hoe"

rebelling / Blackmail
using him to get thin...

threatened to tell

really bad
...penis on my vagina
...rs inside me – would hurt
...closer, slap my butt
...ne "deserved it" – hand job

sometimes I
– would tell
him to stop

when did he st...

2012

13

- put his fingers inside, rub my chocha with his
                                                    penis

Black mail him
o get things
to tell

d he start doing it less?

After the court and defense counsel discussed the physical appearance of the timeline, the prosecutor stated that P.C. had told the prosecutor that she wanted to "use [the timeline] to clarify her testimony yesterday with the prior statement yesterday regarding seven." According to the prosecutor, "[P.C.] stated that seven was referring to [the] . . . loss of her virginity [in seventh grade] as opposed to, as indicated, seven sexual partners."

Defense counsel stated that he was concerned with whether the timeline would assist P.C. in recalling the events in question. Defense counsel also stated that the timeline "appears to have been prepared by more than one person."

As to defense counsel's first concern, the court stated that it found that the timeline would assist P.C. in recalling events from her childhood. As to the second issue, the court stated, "[Y]ou're asking whether it contains hearsay." Defense counsel responded, "Yes." The court continued, "It was prepared by someone else." The court continued by stating that "the document itself is not being introduced into evidence," and "even though it might contain hearsay statements and it was — she was assisted by other individuals, if that will help her recall the events, then it's admissible."[14]

The prosecutor then stated:

---

[14]   Although the court stated that the timeline would be "admissible," it is undisputed that the court did not formally admit the timeline in evidence. However, as discussed below, the court permitted the People to display the timeline to the jury and permitted P.C. to read statements directly from the timeline.

15

"If I could add to that, Your Honor? [¶] As a demonstrative exhibit — first, I don't see any hearsay statements on here. I see this [as] representative, basically, of her testimony up until this point. [¶] And as a demonstrative exhibit — if I were to have a blank piece of butcher paper like this next to the witness stand and if [I] were to write phrases similar to this as she testified to those and each time confirmed whether that was representative of her testimony, that is a perfectly legitimate demonstrative exhibit. And this is really no different. [¶] From the style of the handwriting, I would guess that her therapist was the one writing this. [¶] But it was based — I don't know. We can ask [P.C.]. [¶] But it's representative of her firsthand account of what she did and what happened to her. [¶] I don't see a single hearsay statement on here."

After further discussion among the court and counsel, defense counsel stated, "Is it appropriate that the members [of] the jury actually see what the witness is refreshing her memory from? [¶] I don't think so."

The prosecutor responded by stating, "Your Honor, that's why I'm seeking it as a demonstrative exhibit." Defense counsel responded to this argument by stating that, if it was proper to display the timeline to the jury, then all of the transcripts of P.C.'s prior statements to investigators should be shown to the jury, as well.[15]

The court indicated that it would hold an Evidence Code 402 hearing on whether the timeline would refresh P.C.'s recollection. The court further stated that if P.C. indicated that "she remembers it all, then the document goes up and the jury will see it . . . ."

---

[15]  The clear implication of defense counsel's argument was that P.C.'s prior statements were inconsistent with her trial testimony.

16

c. *The Evidence Code section 402 hearing*

Immediately thereafter, the court held an Evidence Code section 402 hearing. P.C. testified at the hearing that she and her therapist made the timeline while P.C. was preparing for the first trial in this case.[16] P.C. stated that they made the timeline because she "wanted all my dates right." P.C. acknowledged that the handwriting on the timeline was her therapist's. When asked how the therapist had known what to write on the timeline, P.C. responded:

> "She was asking me like questions about it. She wanted like to start from the beginning. And she was asking me questions like . . . my feelings or like asking me how . . . I remembered. [¶] Everything that I was telling her that happened, she was trying to have facts that — memories to back it up so I know to say like what reminded me of it, how I remembered it."

P.C. explained that some of the terms used on the timeline had been suggested by her therapist. For example, P.C. stated that while she used the term "choca,"[17] in describing the abuse to her therapist, the therapist wrote the word "vagina" on the timeline. P.C. explained, "[The therapist] was trying to get me prepared [with] what words to say so I would say it correctly." P.C. said that the information on the timeline would help her remember what had happened.

After the testimony, the prosecutor argued that the timeline would "refresh [P.C.'s] recollection as it dates events, times that she's been challenged on over the course of the

---

[16] As indicated in part I, *ante*, at a prior trial of this matter, a jury was unable to reach a verdict. The prior trial was held in January 2015.

[17] P.C. stated that "choca" is a Spanish slang term for vagina.

afternoon yesterday." The prosecutor argued further, "And, also, it's demonstrative of her testimony of her experiences and should be shown to the jury."

Defense counsel agreed that the timeline could be used to refresh P.C.'s memory. However, defense counsel stated, "I don't agree it's demonstrative evidence that should be shown to the jury."

The court ruled: "I'm going to grant the People's motion. [¶] I will allow it to be used [as] a demonstrative piece of evidence and it may be published to the jury."

### d. *P.C.'s redirect examination*

After the court concluded the Evidence Code section 402 hearing, defense counsel completed his cross-examination of P.C. Immediately thereafter, on redirect, the prosecutor displayed the timeline to the jury. P.C. testified that she had created the timeline of Vasquez's abuse of her during "therapy," while preparing for the first trial or the preliminary hearing in this case. P.C. explained that she had described the abuse to the therapist and that her therapist had written events on the timeline based on P.C.'s description.

The prosecutor then asked P.C. a number of questions concerning statements that were written on the timeline. For example, P.C. explained the portion of the timeline detailing her earliest interactions with Vasquez, including when he took her to a movie called Polar Express. Later, the prosecutor stated, "We talked about the *Polar Express* movie. The fall/winter of 2004 is what it shows on there. Okay. [¶] And then what about the touching? Does it help you remember when the touching started, what happened?" (Boldface omitted.) P.C. responded affirmatively and explained that the timeline stated,

"Touched me for [first time]," and "[s]leeping in mom's bed." P.C. further explained, "Touching. [The therapist] was like *what kind of touching*. She asked me. And I told her, 'Touching leg [and butt], but would put hand in my underwear and also touched my vagina.' "[18]

P.C. stated that photocopies of her school identification cards were placed on the timeline to help her "visualize how [she] looked." P.C. explained, "That helps me a lot." P.C. further stated that the photographs depicted her as she gained weight when Vasquez "started touching me the most." P.C. stated, "I wrote[,] 'Touching me really bad. Rubbed his penis on my vagina.' "

P.C. stated that the portion of the timeline that states "[E.C.] came in" referred to an incident during which E.C. saw Vasquez touching P.C. inappropriately and E.C. thought that P.C. and Vasquez had been playing "Claws."[19] P.C. stated that she and Vasquez were not in fact playing Claws, but rather, it was one of "those times when he would touch me at the house." P.C. stated that she thought that E.C. came in while P.C.'s "pants or whatever I was wearing was down."

The prosecutor continued the examination in a similar manner, with either P.C. or the prosecutor reading statements from the timeline concerning the sexual abuse described on the timeline, and P.C. describing the incidents summarized therein, in

---

[18]    In describing the manner in which Vasquez allegedly touched her, P.C. read from the timeline.

[19]    As discussed in part II.A.1.c, *ante*, E.C. described an incident during which E.C. saw Vasquez touch P.C. inappropriately while the sisters and Vasquez were playing the tickling game that they called "Claws."

response to questions posed by the prosecutor. For example, quoting from the timeline, the prosecutor stated, " 'He did weird stuff to me like dry humping, rubbing bodies with clothes on.' What does that refer to?"

P.C. responded:

> "Like that's where it started getting worse. It wasn't touching or feeling on me anymore. It was like rubbing each other, like him on top of him [*sic*] or me on top of him, with no clothes on."[20]

The prosecutor also asked P.C. about the statement on the timeline that states, "told window people he had sex with me because sex meant something different to me — dick rubbing choca." P.C. explained that this referred to her disclosures of the abuse to forensic interviewers. P.C. testified that she told the interviewers that she had had sex with Vasquez because she had understood "sex" to mean all forms of sexual activity.[21] However, P.C. reiterated that she had never had sexual intercourse with Vasquez.

At the close of the redirect examination, the court instructed the jury:

> "I'll note for the jury that this item has been marked as an exhibit. It's what is referred to as a *demonstrative* piece of evidence. [¶] The witness is able to testify using it to refresh her recollection and it is essentially being published to you right now because you can see it. [¶] However, it will not be admitted into evidence and become an

---

[20]    As noted in the text, although the timeline stated "with clothes on," P.C. testified at trial that the timeline referred to incidents "with no clothes on."

[21]    P.C. explained that this was the reason she became confused when questioned about her prior statements that she and Vasquez had engaged in various types of sexual activity. For example, P.C. explained:

> "For me sex was just sex, like anything, like touching. That's why I get really confused when they say[,] ['][W]hat did you mean by [ ]blow job, what did you mean by this[?]' [¶] I was — I was 12. I wasn't going to act like I knew everything. Like I thought I knew everything." (Italics omitted.)

item that will go into the jury room during your deliberations. [¶] So what you're looking at now, this is your opportunity to see it. You will not have an opportunity to view it during your deliberations."

e. *The prosecutor's closing argument*

During his rebuttal closing argument, the prosecutor displayed the timeline for the jury, and repeatedly referred to it in urging the jury to find Vasquez guilty. For example, the prosecutor stated, "This is the timeline that [P.C.] made. Sat down with her therapist and wrote this out, detailing, as best she could, the victimization that she suffered at the [h]ands of the man who's supposed to be a father figure."

The prosecutor also argued that the jury should rely on the timeline in rejecting the defense's contention that inconsistencies between P.C.'s prior statements and her trial testimony were significant:

> "[The prosecutor:] And then [to] take some cheap shots again at a girl who is going to Children's Hospital to talk about years of molestation. [¶] . . . [¶] Going to Children's Hospital to talk about years of molestation and using grownup words for grownup acts and being critical of her for not getting it all completely straight? [¶] *Well, she writes it all right here.* [¶] Her idea of sex at that time was a penis touching a vagina, not too far off from what a lot of people would characterize it." (Italics added.)

The prosecutor, continued, "And she spells it out for you right here. It's all right here. Her view, her perception of what it was, she explained it."

Finally, in his very last words to the jury, the prosecutor stated:

> "They told you what he did. They told you. *They showed you in writing.* They showed you with their emotions. They showed you with their testimony. He's guilty. [¶] Thanks for listening." (Italics added.)

21

## 2. *Governing law*

### a. *Refreshing a witness's recollection*

Evidence Code section 771, subdivision (a) permits a witness to "use[ ] a writing to refresh his memory with respect to any matter about which he testifies."  However, when a writing is used to refresh a witness's recollection, " '[t]he writing is used by the witness solely to assist [the witness] in giving his oral testimony.' "  (*People v. Lee* (1990) 219 Cal.App.3d 829, 840 (*Lee*).)  " 'It has no independent evidentiary value for the party calling [the witness], and is not admissible in evidence at his instance.' "  (*Ibid.*)

In addition, it is well established that "[s]tatements which have no independent basis of admissibility may not be introduced under the guise of refreshing a witness' memory.  If it is necessary to refresh the memory of a witness through the use of a prior recorded statement, that statement should not be read aloud before the jury but should be given to the witness to read or be read by the attorney *outside the presence of the jury*."  (*People v. Parks* (1971) 4 Cal.3d 955, 960–961 (*Parks*), italics added.)  Further, the party offering a writing to refresh a witness's recollection does not have "a right to have the jury see [the writing]."  (*Estate of Packer* (1913) 164 Cal. 525, 530.)  "That the offering party has not the right to treat it as evidence, by reading it or showing it or handing it to the jury, is well established."  (*Ibid.*)

### b. *Demonstrative evidence*

"Demonstrative evidence is evidence that is shown to the jury 'as a tool to aid the jury in understanding the substantive evidence.' "  (*People v. Diaz* (2014) 227 Cal.App.4th 362, 384, fn. 19 (*Diaz*).)  Common examples of demonstrative evidence

include "maps, charts, and diagrams" (*Mills*, *supra*, 48 Cal.4th at p. 207), all of which "illustrate a witness's testimony." (*Ibid.*)

" '[D]emonstrative evidence is admissible for the purpose of illustrating and clarifying a witness' testimony' so long as a proper foundation is laid." (*People v. Roldan* (2005) 35 Cal.4th 646, 708.) For example, a prosecutor may use " 'objects similar to those connected with the commission of a crime for purposes of illustration.' " (*Ibid.* [concluding "trial court properly permitted the prosecutor to display a gun similar to defendant's for demonstrative purposes because the actual gun defendant used was never recovered"].)

Demonstrative evidence, however, is not to be used as *substantive* evidence. (See, e.g., *Duenas*, *supra*, 55 Cal.4th at p. 21 ["a computer animation is not substantive evidence used to prove the facts of a case; rather it is demonstrative evidence used to help a jury to understand substantive evidence"]; compare with *People v. Goldsmith* (2014) 59 Cal.4th 258, 267 ["ATES evidence [related to a red light traffic camera] was offered as substantive proof of defendant's violation, not as demonstrative evidence supporting the testimony of a percipient witness to her alleged violation"].) In *Duenas*, the defendant contended that a computer animation was inadmissible because it was cumulative of other testimony at trial. (*Duenes*, at p. 25.) In rejecting the defendant's argument, the Supreme Court explained the distinction between substantive evidence and demonstrative evidence, stating, "[Defendant's] argument misapprehends the animation's role as demonstrative evidence. The animation was not offered as substantive evidence, but as a tool to aid the jury in understanding the substantive evidence." (*Ibid.*)

23

### c. *Hearsay*

Hearsay is defined as "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) "Except as provided by law, hearsay evidence is inadmissible." (Evid. Code, § 1200, subd. (b).)

Two such exceptions to the hearsay rule are commonly referred to as the prior consistent statement exception (Evid. Code, § 1236) and the past recollection recorded exception (Evid. Code, § 1237.)

Notwithstanding the hearsay rule, evidence of witness's *prior consistent statements* may be admitted to rebut evidence of the witness's prior inconsistent statement where the consistent statement was made before the alleged inconsistent statement. (Evid. Code, §§ 1236, 791, subd. (a).) Prior consistent statements are also admissible for their truth to rebut a charge of improperly motivated testimony when the prior consistent statement was made before the improper motive was alleged to have arisen.[22] (Evid. Code, §§ 1236, 791, subd. (b).)

Among other requirements, the hearsay exception for *past recollection recorded* requires that the statement "[w]as made [by the witness] at a time when the fact recorded in the writing actually occurred or was fresh in the witness' memory." (Evid. Code, § 1237, subd. (a)(1).)

---

[22]    As discussed below, Evidence Code section 791 governs the admissibility of a witness's prior consistent statements offered to support the witness's credibility. (See pt. III.A.2.d, *post*.)

24

d.  *A witness's prior consistent statements*

Evidence Code section 791 governs the admission of a witness's prior statements to support the witness's credibility and provides in relevant part:

> "Evidence of a statement previously made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after:
>
> "(a) Evidence of a statement made by him that is inconsistent with any part of his testimony at the hearing has been admitted for the purpose of attacking his credibility, and the statement was made before the alleged inconsistent statement; or
>
> "(b) An express or implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen."

3.  *The trial court erred in permitting the People to display the timeline and allowing P.C. to testify as to statements on the timeline*

   a.  *It was improper to permit the timeline to be displayed to the jury as a writing being used to refresh P.C.'s recollection*

The Supreme Court noted more than a century ago that it was " 'well established' " (*Estate of Packer*, *supra*, 164 Cal. at p. 530) that a party refreshing a witness's recollection with a writing "has *not* the right to treat [the writing] as evidence, by . . . showing it . . . to the jury." (*Ibid.*, italics added.)  To permit such a display would be to effectively present the writing as evidence, "under the guise of refreshing a witness' memory." (*Parks*, *supra*, 4 Cal.3d at pp. 960–961.)  Further, since writings used to refresh a witness's recollection need *not* be *admissible* evidence (see e.g., *Lee*, *supra*, 219 Cal.App.3d at p. 840 ["[a] witness may refer to hearsay to refresh his recollection"]), the

practice of displaying such writings to the jury was long ago condemned by the Supreme Court because it "would open the door to the admission of hearsay and manufactured evidence without limit." (*Estate of Packer*, at p. 530.)

Notwithstanding this well-established law, the People contend that it was permissible for the trial court to allow the prosecutor to display the timeline to the jury because, due to the size of the timeline, "it was not practical to show P.C. the timeline and then take it away after her memory was refreshed." To begin with, we are aware of no authority, and the People have cited none, that would support such an exception to the long-standing rule that a jury is not to be shown writings being used to refresh a witness's recollection by the party offering the writing. Further, the People have not provided any reason for this court to create a "practicability" exception to the well-established law discussed above, that would permit the display of inadmissible evidence to the jury, and we see no need for such an exception. The prosecutor could have refreshed P.C.'s recollection with the timeline merely by having her look at the document before testifying or photographing the timeline and showing her the photographs during her testimony. In short, the fundamental prohibition against displaying inadmissible evidence to the jury may not be circumvented merely because the proponent of the writing believes that it would not be practicable to use a method of refreshing the witness's recollection that would not require displaying the writing to the jury.

b.  *The timeline does not qualify as demonstrative evidence*

Vasquez contends that the trial court erred in permitting the prosecutor to display the timeline as demonstrative evidence. We agree. The timeline did not "illustrate

26

[P.C.'s] testimony" (*Mills*, *supra*, 48 Cal.4th at p. 207), by summarizing or diagraming her testimony. In arguing for its display in the trial court, the prosecutor compared the timeline to a chart that counsel might create at trial summarizing a witness's testimony. The People echo this argument on appeal, contending that the timeline was properly displayed to the jury as a demonstrative exhibit because "it is common sense that some jurors might be able to understand the [witness's] testimony better if it were presented visually."

While we agree that a chart summarizing a witness's testimony might constitute a proper demonstrative exhibit, the timeline in this case bears no resemblance to such a chart. To begin with, and most fundamentally, the timeline was based on *out-of-court* statements made by P.C to her therapist, *not* on her in-court testimony.[23] As defense counsel correctly argued, displaying the timeline to the jury was no different from permitting the defense to display for the jury P.C.'s inadmissible and inconsistent out-of-court statements contained in transcripts of P.C.'s interviews with investigators.

In addition, the prosecutor argued that the jury should accord the timeline *substantive* effect in proving the charged offenses, an impermissible use of demonstrative evidence. (See *Duenas*, *supra*, 55 Cal.4th at p. 21 [stating that item of demonstrative evidence is "not substantive evidence used to prove the facts of a case"].) The prosecutor argued to the trial court that the timeline should be shown to the jury because it "provides

_____

[23] As discussed previously, P.C. testified that it was her therapist's handwriting that appears on the timeline. P.C. also stated that the therapist rephrased P.C.'s use of slang terms for various body parts in drafting the timeline.

27

a chronology, written firsthand by [P.C.], of [P.C.'s] experience." During his closing argument, the prosecutor told the jury that P.C. wrote the timeline "with her therapist . . . detailing, as best she could, the victimization that she suffered at the [h]ands of the man who's supposed to be a father figure." In addition, the prosecutor argued to both the trial court and the jury that the timeline was relevant in determining P.C.'s *credibility*. In the hearing on whether the timeline should be published to the jury, the prosecutor stated that the timeline is "certainly useful to the trier of fact [in] determin[ing] [the] credibility of the witness, [and the] accuracy of testimony." Indeed, the prosecutor candidly acknowledged that P.C. had brought the timeline to court so that it could be displayed to the jury in order "to clarify her testimony yesterday." During his closing argument, the prosecutor urged the jury to rely on the timeline in rejecting the defense's claim that inconsistencies in P.C.'s forensic interview demonstrated that she was being untruthful. We are aware of no authority that would permit the jury to rely on a *demonstrative* exhibit in such a fashion in determining the *credibility* of a witness.

In sum, the trial court erred in permitting the People to display the timeline as demonstrative evidence.

### c. *The trial court erred in permitting the prosecutor and P.C. to read statements directly from the timeline into evidence*

Vasquez contends that the trial court erred in permitting P.C. and the prosecutor to "read from and recount what was depicted on the timeline." Vasquez maintains that this questioning resulted in the jury hearing extremely prejudicial hearsay statements from the timeline read into evidence such as, "Rubbed his penis on my vagina."

28

A writing being used to refresh a witness's recollection "should not be read aloud before the jury . . . ." (*Parks*, *supra*, 4 Cal.3d at pp. 960–961.) The People do not argue otherwise. However, the People raise two arguments in response to Vasquez's contention. First, the People maintain that Vasquez forfeited his claim that the prosecutor improperly used the timeline because defense counsel "never objected to the form of the prosecutor's questions about the timeline." We reject the People's forfeiture argument. Defense counsel specifically contended that it was improper to allow "the jury [to] actually see what the witness is refreshing her memory from[.]" This is a correct statement of law that adequately preserved Vasquez's objection that it was not proper to permit P.C. to read statements from the timeline into the record or to allow the jury to view the statements written on the timeline. Once the trial court permitted the People to display the timeline to the jury, raising an objection to P.C. reading from the timeline would have been futile. The People also argue that the trial court properly allowed "P.C. to directly explain some of the things shown on the timeline" because the "trial court had ruled that the timeline could be used as demonstrative evidence." However, in light of our conclusion that the trial court erred in permitting the prosecution to use the timeline as demonstrative evidence, the prosecutor's questioning and P.C.'s testimony cannot be affirmed on this basis.

Accordingly, we conclude that the trial court erred in permitting the prosecutor and P.C. to read statements directly from the timeline into evidence and in allowing the jury to view the statements written on the timeline.

### 4. *The error requires reversal*

A judgment may be reversed on appeal for improper admission of evidence only if "it is reasonably probable that a result more favorable to the [defendant] would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*); see, e.g., *People v. Covarrubias* (2016) 1 Cal.5th 838, 886–887 [applying *Watson* in determining whether trial court's erroneous admission of evidence was prejudicial].) Reasonably probable in this context "does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*." (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715, citing *Watson*, *supra*, at p. 837.) In assessing prejudice, we consider both the magnitude of the error and the closeness of the case.

The trial court improperly permitted the People to display an approximately twenty-foot long timeline on which were written descriptions of the alleged molestations together with photographs of P.C. as a child, during both P.C.'s testimony and closing argument.[24] Through the display of the timeline and P.C.'s testimony concerning the timeline, the jury learned that P.C. had attended therapy sessions to address the alleged abuse, a fact that had not been addressed in her initial direct examination. The "inflammatory" nature of the contents of the timeline, which was likely to have an emotional impact on the jury, heighted the possibility of prejudice from its display.

---

[24]     As noted previously, we have included photographs of the timeline in part III.A.1.b, *ante*.

(*People v. Burroughs* (2016) 6 Cal.App.5th 378, 383 [stating that "inflammatory documentary and testimonial hearsay was prejudicial" under *Watson*].)

Further, the timeline contained details of the alleged molestations and P.C.'s emotional responses to such molestations beyond that which P.C. had testified to during her initial direct examination. For example, an entry on the timeline indicated that the first touching had occurred "around Christmas." Another entry on the timeline stated, "slap my butt felt like he 'deserved it.' " A third entry on the timeline stated that P.C. felt as though she had "betrayed [Vasquez]," by having sex with another person. P.C. did not testify to any of these aspects of the molestations during her initial direct testimony.

In addition, displaying the timeline and permitting P.C. to read statements from the timeline into evidence allowed the People to rehabilitate P.C. after vigorous cross-examination through the use of her prior statements, notwithstanding that those statements were not admissible under Evidence Code section 791.[25] Moreover, the display of the statements and the reading of them into evidence permitted the jury to consider the statements for their truth, despite the fact that the statements were made outside of court and we are aware of no possible relevant hearsay exception through which the statements could have been admitted.[26] Further, as recounted in part III.A.1.e,

---

[25]    We emphasize that the People have not argued either in the trial court or in this court that the statements on the timeline were admissible as prior consistent statements under section 791.

[26]    In particular, the statements were not admissible as prior consistent statements under Evidence section 1236 because they were not offered in compliance with Evidence Code section 791. Nor were the statements admissible as a past recollection recorded since it is undisputed that the statements were not made "at a time when the fact recorded

31

*ante*, the prosecutor relied extensively on the timeline at trial. The prosecutor engaged in an extensive redirect examination of P.C. concerning the timeline's contents while displaying the timeline to the jury. In addition, the prosecutor displayed the timeline to the jury during his rebuttal closing argument and referred to it either expressly or implicitly on four occasions during that argument. Among these references were the prosecutor's final statements to the jury in which he stated that the victims had "showed [the jury] in writing" that Vasquez had committed the charged offenses. The prosecutor's heavy reliance on the improperly displayed timeline and the related testimony heighted the possibility of prejudice. (See *Diaz*, *supra*, 227 Cal.App.4th at p. 384 ["A prosecutor's reference to evidence that should not have been presented to the jury increases the potential for prejudice flowing from the error"].)

The strength of the evidence of Vasquez's guilt was not so overwhelming that we can conclude that this serious error, which infected a large portion of the trial, was harmless. A prior trial at which the timeline was not displayed, but at which the evidence presented was otherwise similar, resulted in a hung jury. (See *Diaz*, *supra*, 227 Cal.App.4th at p. 385 [a previous hung jury "supports a finding of prejudice in light of the fact that the evidence presented at both trials was similar, with the significant exception that the [improperly admitted] videos were *not* shown at the first trial"]; *People*

in the writing actually occurred or was fresh in the witness' memory." (Evid. Code, § 1237, subd. (a)(1).) The People have not argued in the trial court or on appeal that the statements on the timeline were admissible pursuant to either Evidence Code section 1236 or Evidence Code section 1237.

32

*v. Soojian* (2010) 190 Cal.App.4th 491, 520 ["under the *Watson* standard a hung jury is considered a more favorable result than a guilty verdict"].)

In addition, there was no physical evidence of the crimes, and the People's evidence of Vasquez's guilt relied almost entirely on the victims' testimony. Moreover, the record contains evidence that could cause a reasonable jury to question the victims' credibility.[27] E.C. and P.C. both acknowledged that their disclosures of the alleged abuse occurred at a time when there was considerable tension between the victims' mother and Vasquez. Patricia stated that Vasquez moved out of the family's residence on July 3, 2012. In their brief, the People state that Patricia called the police to report the alleged abuse three days later, on July 6, 2012. The prosecutor acknowledged during closing argument that P.C.'s motivation in disclosing the alleged abuse was to retaliate against Vasquez for his threat to have Patricia deported.[28] P.C. was vigorously cross-examined on a number of inconsistencies with respect to her prior statements.

The People's arguments in support of their contention that any error in the use of the timeline was harmless are not persuasive. The People contend that P.C. had testified to "virtually everything contained on the timeline," prior to its display. We disagree. As discussed above, there were several aspects of the alleged molestations recounted on the timeline that had not been addressed in any manner during P.C.'s direct examination.

---

[27]    We again stress that we are not stating that this court questions the victims' credibility. Rather, we state only that there is evidence in the record from which a reasonable jury could find that the victims lacked credibility.

[28]    The prosecutor told the jury, "[Vasquez] had threatened to call immigration on [P.C's] mom [Patricia] and have her deported again. [¶] That was [P.C.'s] motivation" for the disclosures.

Moreover, as the People acknowledge, the display of the timeline permitted P.C. to "provide more detail about her answers" concerning the alleged molestations. Even assuming that P.C. would have been able to provide additional details concerning the alleged molestations if her memory had been *properly* refreshed by the use of the timeline, permitting the timeline to be displayed to the jury and allowing P.C. to read statements from the timeline into evidence served to improperly bolster P.C.'s credibility beyond that which would have been permissible through the proper use of the timeline to refresh P.C.'s recollection.

The People also assert that the victims were "credible witnesses." To begin with, a prior jury was unable to reach a verdict notwithstanding having heard similar testimony from E.C. and P.C. regarding the alleged molestations. Further, the People acknowledge various aspects of the victims' testimony that a jury could have found supported a finding that the abuse allegations had been fabricated. For example, the People acknowledge that P.C.'s motivation for disclosing the abuse was retaliatory and that P.C. was required to "explain[ ] some of the inconsistencies" in her prior statements. Moreover, P.C. explained all of the inconsistencies that the People refer to in their brief (i.e., P.C.'s statements that Vasquez had "raped" her, that she had given Vasquez a "blow job," and that she had "sex" with Vasquez) in part through the improper use of the timeline.

In sum, we are compelled to conclude that it is reasonably probable that the jury would have reached a result more favorable to Vasquez in the absence of the erroneous display of the timeline and the admission of the related testimony. Vasquez is entitled to

34

a new trial during which the People may attempt to prove his guilt without the jury viewing the timeline and without statements from the timeline being read into evidence.

B. *Vasquez has not demonstrated the existence of a discriminatory prosecution or the need for a recusal of the district attorney's office*

Vasquez claims that the trial court erred in denying his motion for a new trial, in which Vasquez argued that a conflict in the district attorney's office resulted in a discriminatory prosecution. He contends that we should reverse the judgment and direct the trial court to dismiss the case. In his reply brief, Vasquez contends that the conflict required recusal of the district attorney's office.

"A prosecutor's discretion to prosecute is constrained by federal principles of equal protection and may not be based on ' "an unjustifiable standard such as race, religion, or other arbitrary classification." ' " (*People v. Montes* (2014) 58 Cal.4th 809, 828.)

A motion to recuse the district attorney's office may be granted " 'whenever the circumstances of a case evidence a reasonable possibility that the [district attorney's] office may not exercise its discretionary function in an evenhanded manner.' " (*Packer v. Superior Court* (2014) 60 Cal.4th 695, 709.)

After the jury reached a verdict in this case, Vasquez filed a motion for new trial. In his motion for new trial, Vasquez alleged that various staff members of the district attorney's office had personal relationships with P.C. and her family. However, Vasquez did not identify any evidence in the record demonstrating that these individuals had any role in prosecuting this case. Vasquez has therefore failed to demonstrate that a conflict in the district attorney's office would preclude his prosecution on the ground that he is

35

being subjected to a discriminatory prosecution or that recusal of the entire district attorney's office is required. We see nothing in the record on appeal that would preclude Vasquez's prosecution by the district attorney's office on remand.[29]

C. *On remand, if similar evidence is presented as was presented in this trial, the trial court should instruct the jury pursuant to the unanimity instruction contained in CALCRIM No. 3501 rather than in CALCRIM No. 3500*

Vasquez contends that the trial court erred in instructing the jury pursuant to a modified version of the standard unanimity instruction contained in CALCRIM No. 3500. Vasquez maintains that because the evidence of the molestations in this case did not provide a basis for the jury to determine specific instances when such molestations occurred, the trial court should have instructed the jury pursuant to CALCRIM No 3501.

CALCRIM No. 3500 provides:

> "The defendant is charged with _____ <*insert description of alleged offense*> [in Count _____ ] [sometime during the period of _____ to _____ ].

> "The People have presented evidence of more than one act to prove that the defendant committed this offense. You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act (he/she) committed."

---

29    We emphasize that we comment only on the record as presented in this appeal. We express no opinion with respect to whether Vasquez would be entitled to either dismissal of the charges or recusal of the district attorney's office if he were to present evidence that the individuals referred to in Vasquez's motion for new trial *did* have a role in prosecuting this case.

CALCRIM No. 3501 provides:

"The defendant is charged with _____ *<insert description[s] of alleged offense[s]>* [in Count[s] _____ ] sometime during the period of _____ to _____.

"The People have presented evidence of more than one act to prove that the defendant committed (this/these) offense[s].  You must not find the defendant guilty unless:

"1. You all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act (he/she) committed [for each offense];

"OR

"2. You all agree that the People have proved that the defendant committed all the acts alleged to have occurred during this time period [and have proved that the defendant committed at least the number of offenses charged]."

As can be seen by a comparison of the two standard instructions, CALCRIM No. 3501 provides an *additional* manner by which a jury may unanimously find a defendant guilty beyond that provided in CALCRIM No. 3500.

In the trial in this case, the People presented generic testimony of the molestations that did not provide a basis for the jury to determine the precise time when specific molestations occurred.  If similar evidence is presented in a retrial, the trial court should instruct the jury pursuant to a modified version of CALCRIM No. 3501.  (See *People v. Jones* (1990) 51 Cal.3d 294, 322 ["when there is no reasonable likelihood of juror disagreement as to particular acts, and the only question is whether or not the defendant in fact committed all of them, the jury should be given a modified unanimity instruction which, in addition to allowing a conviction if the jurors unanimously agree on specific

acts, also allows a conviction if the jury unanimously agrees the defendant committed all the acts described by the victim"].)

We also note that the trial court instructed the jury on the concept of unanimity pursuant to a modified version of CALCRIM No. 3500 as follows:

> "The defendant is charged with Lewd Act Upon a Child in Counts One through Eight.
>
> "The People have presented evidence of more than one act to prove that the defendant committed these offenses.  You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed."[30]

It appears that the trial court intended for the instruction to state as follows:

> "The defendant is charged with Lewd Act Upon a Child in Counts One through Eight.
>
> "The People have presented evidence of more than one act to prove that the defendant committed [each of] these offenses.  You must not find the defendant guilty [of each offense] unless you all agree that the People have proved that the defendant committed at least one of these acts [for each offense] and you all agree on which act he committed."

CALCRIM No. 3500, unlike CALCRIM No. 3501, does not contain a bracketed modification option to be used in cases in which the instruction is used for multiple offenses.  To the extent that the trial court instructs the jury pursuant to a modified

---

30    Vasquez also notes that the unanimity instruction given by the trial court did not contain a date range for each count and did not describe the particular acts for each count as do the standard instructions in both CALCRIM Nos. 3500 and 3501.  While in light of our reversal of the judgment on other grounds we need not consider whether such omissions were erroneous and prejudicial, we note the omissions for the benefit of the trial court on remand.

CALCRIM unanimity instruction on remand with respect to multiple counts, it shall ensure that the instruction is properly modified to account for such multiple counts.

IV.

DISPOSITION

The judgment is reversed.


AARON, J.

WE CONCUR:

McCONNELL, P. J.

NARES, J.