Filed 5/28/21  P. v. Inouye CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br>        Plaintiff and Respondent,<br><br>v.<br><br>SCOTT MICHAEL INOUYE,<br>        Defendant and Appellant. | A159513<br><br>(San Mateo County Super<br>Ct. No. 18NF011459) |

Defendant Scott Michael Inouye appeals from a judgment of conviction after a jury trial for eavesdropping and dissuading a witness.  The offenses involved his surreptitious audio-video recordings of sexual interactions between him and a tourist from South Korea, Jane Doe, after he met her while working as a customs and border protection officer at the San Francisco airport.  Defendant makes two claims on appeal:  that the trial court prejudicially erred by admitting evidence of his job because his work was not relevant to the charges against him and unduly prejudiced the jury under the circumstances of the case, and that the court erred at sentencing in requiring him to pay two assessments as a condition of probation.  We affirm the judgment, except that we remand to the trial court to clarify that the assessments are imposed separate from, and not as, the conditions of probation.

1

## BACKGROUND

In June 2019, the San Mateo County District Attorney filed an information charging Inouye with three counts of eavesdropping (Pen. Code, § 632, subd. (a)[1]) and one count of attempting to dissuade a witness (§ 136.1, subd. (b)(2)). The charges were based on his repeated recording of his sexual interactions with Jane Doe without her knowledge or consent and, when Doe discovered the recordings and reported them to the police, his repeated suggestions that she falsely tell the authorities that she consented to the recordings in order to have the matter against him dropped.

## I.

### *Evidence Presented at Trial*

#### A. Inouye and Doe Initiate a Sexual Relationship.

The parties disagreed at trial regarding Inouye's intent but did not dispute most of the facts. On June 21, 2018, Doe arrived at San Francisco's airport from South Korea to visit the area on vacation. Inouye, then a customs and border protection officer working at the airport, processed Doe's entry into the United States. She gave him the information he requested, including her contact information for a Korean messaging application. He messaged her later that day, and they met away from the airport that evening and exchanged messages daily thereafter. A few days later, on June 24, Doe visited Inouye's apartment in San Bruno. They had sexual relations that night, after which she showered in his bathroom. At trial, she identified a video recording of her showering and testified that it was recorded without her knowledge or consent.

---

[1] All statutory references are to the Penal Code unless stated otherwise.

Doe stayed with Inouye for several days. The two continued to engage in sexual intimacy and did other things together, but Inouye did not want a long-distance relationship and said the differences in their cultures and language skills (Doe spoke some English but did not understand everything Inouye said, and Inouye's Korean was limited to certain phrases) would make it difficult to have one. Nonetheless, he wanted her to stay in his apartment while she was in the country.

On July 4, 2018, Doe left to visit Los Angeles. She returned on July 25, 2018, and again stayed with Inouye, paying him some rent at his request. They continued to have sexual relations, and she believed everything that happened between them was private.

## B. Doe Discovers Inouye's Recordings.

Around August 10, 2018, Inouye left town to visit his family. He gave Doe access to his computer while he was gone. While using it, Doe saw an electronic folder named with initials she used in messenger applications and online and opened it. The folder contained photographs and videos of her taken without her knowledge or consent, including of her taking a shower and engaging in sex with Inouye. She also discovered videos of Inouye having sex with other women on the same computer. She searched Inouye's bedroom and found a small camera on a nightstand by his side of the bed. She later called the police, who discovered sexually explicit videos of Inouye and Doe on the computer's hard drive and at a cloud storage site associated with Inouye's Google account.

Four videos of Doe and Inouye engaging in sex and talking were played at trial, and audio transcripts of them were provided to the jury. Doe testified that the videos accurately depicted what had occurred, feeling so sick at one point while viewing them that the court ordered a recess. She

3

also testified that she once talked with Inouye about a news report that a Korean man had video-recorded his sexual encounters with a former girlfriend for revenge and told Inouye she could not understand "why anybody would do such a thing." She did not recall his reaction and denied that he ever told her that he had recorded other women before or that he wanted to record his sexual encounters with her.

Inouye testified that in surreptitiously recording Doe showering, he realized he "couldn't capture images of her body from the shower because of the angle," so he used his nightstand camera to surreptitiously record several of his sexual encounters with her. He kept "the sex parts, parts where I could see her body." He had previously recorded his sexual encounters with a flight attendant whom he only saw "every now and then," also without her consent. After breaking up with a fiancée, he had difficulty adjusting "to the lack of physical intimacy with other dating partners," and made the recordings for his own sexual gratification with "the intent of being a happier person and happier towards these women." When Doe told him about the news report of the Korean man recording his ex-girlfriend, he told her he had taken videos "with all of my prior ex-girlfriends" and would never use the recordings to intentionally hurt or shame them. She smiled, dropped the subject and did not tell him not to record her.

## C. Inouye Suggests What Doe Should Do to Help Him.

After receiving Doe's report and seeing the photographs and videos, the police called Inouye. He agreed to drive from Vallejo to the San Bruno police station for an interview.

Inouye testified that he then called Doe and "asked her why she didn't call me first before calling the police. . . . And she said I was afraid you would be mad and hurt me. [¶] And I told her that would be the last thing I would

4

ever plan to do." He asked for "a chance to try to apologize and explain things," but needed to pack up and go to the police station.

Inouye phoned Doe again as he drove to the station. The call was recorded on his dashboard camera, which recording was played at trial. Inouye told Doe he was very sorry but couldn't "even focus on apologizing right now" because he had to take care of the police matter, which "is gonna be very bad for me." He said he had known Doe would not be around for a while and had wanted something to "remember us by," and acknowledged it was "a very dumb way to go about doing it" and unjustified. He said he wanted to regain her trust and would have "a lifetime to figure that out . . . if you let me live my life." He said, "I don't wanna make you lie or anything but I'm just . . . [¶] I think the only way that we could get out of this is if, you said you . . . had an argument with me and then you . . . wanted to use it against me because it was actually consensual. I don't know." He pleaded: "Please [Doe], please . . . let's got [*sic*] to the station together [and] say it was an argument or it was a bad decision. I don't know." He said he "really liked" and "love[d]" her "truly." He asked, "Can you meet me [at the police station]? Can I meet you? Can we go in together say it was a very bad—very spur-of-the-moment emotional thing?" He also asked Doe if she could "go back yourself and delete" the recordings.

Inouye told Doe he expected to be arrested and that "the only thing I can think if you're with me and you say it was consensual and you just—we got in an argument and you—I don't know that's the only thing I can think of . . . right now." He said he would say the recordings were consensual or a misunderstanding and added, "They call you to ask. You say yes, we had a bad argument and—I don't know." He also told her: "That's the only thing I can think of, you have to tell 'em it was consensual, we had an argument . . . .

5

I can't think of any other way for you to say something like that and then change your mind."

At trial, Inouye denied trying to dissuade Doe from being a witness against him. He said telling her she should say the recordings were consensual was "a suggestion that I could think of at the time when I believed that she, after hearing my apology, wanted to help me." He thought from the text messages she had sent to him the day she reported the videos to the police and from her initial response to his call "that she still cared about me[,] [s]he was just afraid," and he thought "we were having the discussion that we never had the chance to have."

Inouye was arrested at the San Bruno police station. Police conducted warranted searches of his apartment and vehicle and seized his computer, the small camera on his nightstand and his dashboard camera. Inouye continued messaging Doe and sent her a link to an article about how to have a case dismissed.

Inouye testified that he continued to communicate with Doe because he was "under the impression that, while she was sad and hurt, she didn't want me in trouble." He did not intend to influence her to drop the case, thinking, "I was just apologizing and having a discussion with someone I was romantically involved with." He acknowledged messaging Doe that his court date was approaching and suggesting she contact the authorities to drop the charges. He said he made this suggestion because he thought "we were still trying to figure a way out of the situation that we mutually did not want to be in." After a mutual friend contacted Doe and told Inouye she did not want to talk with him, he had no further contact with her.

6

## II.

### *Verdict, Sentencing and Appeal*

The jury found Inouye guilty of all charges. The trial court suspended imposition of sentence, placed him on probation for three years on the condition that he serve one year in jail, and imposed certain probation conditions, assessments, fines and fees. Inouye timely appealed.

## DISCUSSION

## I.

### *The Court Did Not Err by Admitting Evidence of Inouye's Job.*

Inouye argues that the trial court committed prejudicial error by allowing Doe to briefly testify that he was working as a customs and border protection officer at the San Francisco airport when they first met. He contends this information was not relevant to the charges against him and unduly prejudiced the jury against him, and that its admission was prejudicial to his case. We disagree.

### A. Relevant Proceedings Below

Before trial, Inouye moved in limine under Evidence Code section 352 to exclude mention at trial of his employment as a customs and border protection officer. He argued this information was irrelevant because he was "not charged with any wrongdoing under color of his employment" and unduly prejudicial because the jury might think he "used his official role to influence [Doe] or to gain some advantage."

The trial court granted Inouye's in limine motion in part and denied it in part. The court prohibited law enforcement witnesses from mentioning Inouye's job or employer. However, the court allowed Doe "to testify, for background purposes, as to how they met in order to put this case in the

7

proper context," adding: "But I think that will be the extent of it. Otherwise, it is not really relevant to the case."

Doe testified at trial with the help of an interpreter. The prosecutor asked her whether she had met someone named Scott Inouye when she came to the United States in the summer of 2018. She said she had and identified Inouye in the courtroom. Asked where she met Inouye, Doe said: "I met him when I entered this country at the airport customs immigration desk when I showed him my passport." She further testified that, in the course of his processing her entry into the country, she answered his questions about her contact information on a Korean messenger application, what she was doing in the United States and where she was staying. She testified that he messaged her and they met outside the airport that same day.

**B. Analysis**

" 'No evidence is admissible except relevant evidence.' (Evid. Code, § 350.) 'Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." ' " (*People v. Hardy* (2018) 5 Cal.5th 56, 87.) Relevant evidence includes " 'evidence relevant to the credibility of a witness or hearsay declarant.' " (*People v. Miles* (2020) 9 Cal.5th 513, 587, quoting Evid. Code, § 210.)

" 'The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' (Evid. Code, § 352.) 'In general, the trial court is vested with wide discretion in determining relevance and in weighing the prejudicial effect of proffered evidence against its probative value. Its rulings will not be overturned on

8

appeal absent an abuse of that discretion.'" (*People v. Hardy*, *supra*, 5 Cal.5th at p. 87.) An abuse of discretion means the trial court acted in an arbitrary, capricious, or absurd manner that resulted in a manifest miscarriage of justice. (*People v. Miles, supra,* 9 Cal.5th at pp. 587-588.)

Inouye argues Doe's testimony about Inouye's job should not have been admitted for two reasons. First, it was not relevant to prove any disputed material fact. Further, the court's stated purpose in admitting the information, to show how he and Doe met in order to put the case in "proper context," could have been achieved by allowing Doe to testify that she met him at the airport when she arrived from South Korea without referring to his employment. Second, Inouye argues that, even if his job had some relevance, its disclosure created undue prejudice against him because the jury may have thought he used his position of public trust to influence Doe or gain an advantage over her, and been harsher towards him for betraying this public trust.

Inouye's arguments are unpersuasive. The court reasonably concluded the details of Inouye and Doe's first meeting were relevant background information that provided useful context for the events that followed. It is not uncommon for courts to allow such background information, even if the information has limited probative value to the actual crimes charged. (See, e.g., *People v. Edwards* (1991) 54 Cal.3d 787, 818 [evidence that shooting victims were close friends, though not "particularly probative," provided jury with "background information" suggesting victims "were preoccupied with each other's companionship, and thus were not concerned about approach of defendant's truck"; "[a]llowing this slight touch of humanity was well within the discretion of the trial court"]; *People v. Duong* (2020) 10 Cal.5th 36, 64, 65 [evidence of defendant's gang affiliation properly admitted to give "context" to

"defendant's willingness to shoot a complete stranger minutes after a verbal spat," although no gang allegations were charged].)

Further, the disclosure of Inouye's job did not cause undue prejudice to him given the undisputed facts and circumstances of the case. " ' " 'Prejudice' as contemplated by [Evidence Code] section 352 is not so sweeping as to include any evidence the opponent finds inconvenient. . . . The code speaks in terms of *undue* prejudice. Unless the dangers of undue prejudice, confusion, or time consumption ' "substantially outweigh" ' the probative value of relevant evidence, a section 352 objection should fail." ' " (*People v. Scott* (2011) 52 Cal.4th 452, 490-491.) Here, the charges, supported by ample and largely undisputed evidence, were that Inouye repeatedly invaded Doe's privacy by recording their sexually intimate interactions without her knowledge or consent and then repeatedly pressured her to lie to the authorities so the investigation and, later, charges against him, would be dropped. Any perceived misuse of his job to initiate a relationship with Doe was of modest significance compared to these charges and the evidence. Also, it was undisputed that Doe freely entered into an intimate relationship with him in the days after they met, diminishing the chance that jurors would be influenced by any pressure or misuse of authority on Inouye's part. Inouye has failed to establish undue prejudice.

In short, the trial court's decision to allow Doe briefly to refer to Inouye's employment in the course of describing how the two met while excluding other witnesses from referring to it was well within its discretion.

For similar reasons, even if the court did err by admitting Doe's testimony about how she met him, it was undoubtedly harmless. "A judgment may be reversed on appeal for improper admission of evidence only if 'it is reasonably probable that a result more favorable to the [defendant]

10

would have been reached in the absence of the error.' " (*People v. Vasquez* (2017) 14 Cal.App.5th 1019, 1041, quoting *People v. Watson* (1956) 46 Cal.2d 818, 836.) Inouye admitted to recording his sexual interactions with Doe without her knowledge or consent, the recordings were played and admitted in evidence, and much of his effort to dissuade her from being a witness against him was captured in recordings and messages that were also played for the jury. Inouye argues that the evidence did not show he intended to record any communications with Doe (as opposed to recording their sexual relations)[2] or that he sought to dissuade her from being a witness against him (as opposed to merely discussing with Doe what to do about a situation that troubled them both). His argument ignores that his multiple recordings included verbal communications between them and that he repeatedly suggested to Doe she should falsely tell the police she consented to the recordings in order for him to avoid arrest and charges.

Inouye also contends statements in the prosecutor's sentencing brief arguing against probation (that he does not contend were inappropriate) which refer to Inouye's job "demonstrated precisely how jurors likely felt about the fact that [Inouye] was a Customs and Border Patrol officer." What the prosecutor said in a sentencing brief submitted after the verdict was rendered has no bearing on whether admission of evidence at trial constituted error, much less prejudice. Had the prosecutor made similar

---

[2] Section 632, subdivision (a), under which Inouye was charged with eavesdropping, punishes "[a] person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication . . . ." The trial court denied the prosecutor's request for a jury instruction that sexual activity constituted a "communication" under section 632 because of a conflict in the case law on the issue.

statements during closing arguments, Inouye might have a plausible argument. The prosecutor did not.

In short, this was not a close case, and it is beyond unlikely that Doe's brief reference to Inouye's job had any effect on the outcome. Any error was harmless.

## II.

### *The Court's Imposition of Certain Assessments Should Be Clarified.*

Inouye also argues the trial court was entitled to impose a court operations assessment and a court facilities assessment (collectively "assessments") but erred by making them conditions of his probation. He contends the fees should be eliminated as conditions of probation. The People contend Inouye has forfeited this claim by not raising it below. They also argue the claim lacks merit and that, to the extent we find the record "ambiguous," we should affirm the order imposing the assessments but modify it to delete them as probation conditions. We conclude the record is at least ambiguous and order that the court take steps to clarify that it is imposing these assessments, but not as conditions of probation.

The People's forfeiture argument lacks merit. A sentence that is unauthorized as a matter of law may be corrected on appeal despite a defendant's failure to object in the court below. (*People v. Scott* (1994) 9 Cal.4th 331, 354 ["the 'unauthorized sentence' concept constitutes a narrow exception to the general requirement that only those claims properly raised and preserved by the parties are reviewable on appeal"].) "Appellate courts are willing to intervene in the first instance because such error is 'clear and correctable' independent of any factual issues presented by the record at sentencing." (*Ibid.*; see also *People v. Relkin* (2016) 6 Cal.App.5th 1188, 1195 [while a failure to make timely objection to a probation condition, such as for

12

unreasonableness, generally forfeits the claim on appeal, "[a]n objection may be raised for the first time on appeal . . . where it concerns an unauthorized sentence involving pure questions of law"].) None of the several cases cited by the People demonstrate this limited exception to forfeiture is inapplicable here. We conclude Inouye did not forfeit his claim and turn to its merits.

In its sentencing report, the probation department recommended "that imposition of sentence be suspended and the defendant be admitted to three (3) years of supervised probation on the following conditions," followed by 20 items, including the assessments. At the sentencing hearing, the trial court said it was admitting Mr. Inouye to "three years of supervised probation on the following terms and conditions." The court then listed the items in the probation report but did not impose them all as conditions of probation. When it came to the assessments, the court said: "[Inouye] is to pay [a] court security fee of $160 through Probation, court criminal conviction assessment of $120 through Probation as directed." After stating its rulings regarding all of the items, the court asked: "You understand and accept these terms and conditions of your probation, Mr. Inouye?" Inouye answered, "Yes, Your Honor."

The parties do not dispute that the trial court was authorized to impose the assessments. (See § 1465.8, subd. (a)(1) [court operations assessment]; Gov. Code, § 70373 [court facilities assessment].) Nor do they dispute that the court was unauthorized to impose either assessment as a condition of probation. Indeed, the court was not authorized by law to do so because "nonpunitive fines and fees that are collateral to a defendant's crimes may not be made a condition of probation unless specifically authorized by statute." (*In re David C.* (2020) 47 Cal.App.5th 657, 671.) As one appellate court has explained: "One reason for the distinction between fines that may

13

be imposed as probation conditions and those that may not is that probation 'should be oriented towards rehabilitation of the defendant and not toward the financing of the machinery of criminal justice.' " (*People v. Pacheco* (2010) 187 Cal.App.4th 1392, 1403, disapproved on other grounds in *People v. McCullough* (2013) 56 Cal.4th 589, 599 and *People v. Trujillo* (2015) 60 Cal.4th 850, 858, fn. 5.)

Thus, it has been held that "[t]he imposition of the court security fee [under section 1465.8] as a condition of probation was unauthorized because like probation costs, this fee is collateral to [the defendant's] crimes and punishment and as such, its payment may not be made a condition of probation." (*People v. Pacheco, supra*, 187 Cal.App.4th at p. 1402; *People v. Soto* (2016) 245 Cal.App.4th 1219, 1237, *In re David C.*, *supra,* 47 Cal.App.5th at pp. 671-672 [both following *Pacheco*].) Another appellate court followed this same approach regarding the court facilities assessment that can be imposed under Government Code section 70373, "in light of the parallel language of the statutes." (*People v. Kim* (2011) 193 Cal.App.4th 836, 843.)

The court's order imposing these assessments was ambiguous regarding whether their payment was a condition of probation. The parties agree that, to the extent the order is ambiguous, we may remedy the situation by an appropriate order that clarifies the assessments are not probation conditions. (See *In re David C., supra*, 47 Cal.App.5th at pp. 671-672 [striking the challenged condition and ordering the trial court on remand to issue a new separate order imposing the subject fine]; *People v. Flores* (2008) 169 Cal.App.4th 568, 579 ["The trial court's probation order is modified to eliminate any requirement that [defendant] pay the costs of probation or attorney fees *as a condition of* probation; however, the trial

14

court's order that defendant pay such costs and fees is affirmed"].) Accordingly, we shall order the trial court to clarify that the assessments are not conditions of probation.

## DISPOSITION

The judgment is affirmed.  The matter is remanded to the trial court for that court to modify its order of probation so as to strike any reference to the court operations and court facilities assessments as conditions of probation and order them to be paid in a separate order.

_____
STEWART, J.

We concur.

_____
KLINE, P.J.

_____
MILLER, J.

*People v. Inouye* (A159513)

16